**James A. BASYE and Evelyn E. Basye, Plaintiffs-Appellees,**

v.

**UNITED STATES of America, Defendant-Appellant.**

**No. 24170–24175.**

United States Court of Appeals, Ninth Circuit.

Sept. 16, 1971.

As Modified on Denial of Rehearing Nov. 23, 1971.

110

Ernest J. Brown (argued), Lee A.
Jackson, Meyer Rothwacks, Lester B.

Snyder, Dept. of Justice, Johnnie M.
Walters, Asst. Atty. Gen., Washington,
D. C., James L. Browning, Jr., U. S.
Atty., John M. Younquist, Asst. U. S.
Atty., San Francisco, Cal., for defend-
ant-appellant.

John Wells (argued), John F. Banker,
of Stark, Simon & Sparrowe, Leonard
Marcussen, Gen. Counsel, The Perma-
nente Med. Group., Oakland, Cal., for
plaintiffs-appellees.

McKnight Brunn, Donald B. Falconer,
of Helzel, Leighton, Brunn & Falconer,
Oakland, Cal., for amicus curiae.

Before MERRILL, DUNIWAY and
HUFSTEDLER, Circuit Judges.

DUNIWAY, Circuit Judge:

Appellee taxpayers brought these con-
solidated actions in the District Court
for the refund of income taxes paid for
the taxable years 1960 through 1963.
The District Court found in their favor,
295 F.Supp. 1289, and the government
appeals. We affirm.

The case was submitted to the district
court on the parties' agreed statement of
facts. Taxpayers are physicians who,
during each of the tax years involved,
were general partners in the Perma-
nente Medical Group (Permanente), a
limited partnership organized in 1949 to
practice medicine in California. The
Articles of Partnership provide that "all
earnings by any of the partners from
the practice of medicine * * * shall
belong to the partnership," and that
each partner's "compensation shall be
restricted to his distributive portion of
the earnings of the partnership." Per-
manente reported its income by the ac-
crual method in the information returns
that it filed for the years involved in
these cases; appellees reported their in-
dividual income by the cash method.

Before the tax years in question, Per-
manente contracted with Kaiser Founda-
tion Health Plan, Inc. (Kaiser) to pro-
vide medical services to members of Kai-
ser in its Northern California region.
Kaiser operates a pre-paid hospital and
medical care program for its dues pay-

ing members. The contract between Permanente and Kaiser provides for exclusivity of service—Kaiser agrees not to contract with other physicians for medical services and Permanente agrees not to render such services to other direct service, prepayment plans. Under the contract Kaiser pays Permanente as compensation for the services of its physicians a monthly sum based on the size of Kaiser's membership. In addition the contract contemplates the creation of a retirement plan to which Kaiser would make additional payments. Such a plan was established to take effect July 1, 1959, by a trust agreement between Kaiser, Permanente and Bank of America National Trust and Savings Association, as trustee. This retirement plan is the focal point of the tax controversy.

The primary purpose of the retirement plan is to insure Kaiser a stable and reliable pool of physicians providing medical service to its members. The plan accomplishes this purpose by creating an incentive for physicians to devote their careers to Kaiser members, either by remaining with Permanente or by joining some other group of physicians contracting to serve Kaiser members. The plan operates in the following manner. Kaiser makes payments into the trust each month as partial compensation for the services of Permanente. Any physician with a minimum of two years service in Permanente, whether or not a partner, is eligible to participate in the plan. Each participant is assigned a certain number of "units" based on such factors as his salary, his past service with Permanente and his age at the time of his association with Permanente. The earnings of the trust fund (payments by Kaiser plus interest accrued on corpus) are tentatively credited to each participant's account in proportion to his assigned number of units.

When a participant retires, the total amount allocated to his account is used to purchase a retirement annuity contract. Until then, however, his account remains merely "tentative" because the amount allocated to it may change or his right to receive it at all may be defeated by the occurrence of one or more specified contingencies. First, if a participant in the plan leaves Permanente for reasons other than death or disability before either age 65 or the completion of fifteen years continuous service, and does not thereafter join another medical group serving Kaiser members, he forfeits all rights to the amount allocated to his tentative account. In the case of forfeiture, the amount forfeited is reallocated among the accounts of the remaining participants; none is ever repaid to Kaiser. Second, a participant will forfeit his right to the accrued benefits even after he has become eligible to receive them if he renders professional services for a competitor of Kaiser or if, while able to do so, he refuses to render consulting services to Kaiser or its affiliates. Third, if Permanente is dissolved or reorganized, and if at least 50% of the participants in the retirement plan reassociate with the reorganized Permanente or with another group serving Kaiser members, the trust fund remains intact and unretired participants who do not join the new group forfeit their accrued benefits. The forfeiture will not occur in two circumstances: (a) by mutual agreement Kaiser and Permanente could use the trust funds to support a new retirement plan which would preserve the accruals of all participants; (b) in the case of dissolution or reorganization without the 50% regrouping, the trust fund is to be liquidated and the proceeds distributed *pro rata* to all participants.

During the four tax years involved Kaiser paid into the trust fund a total amount in excess of $2 million. Net earnings on the corpus amounted to an additional $60 thousand. Permanente did not report these amounts in its partnership income returns, nor did the partners include them in their individual returns. The Commissioner of Internal Revenue determined that the omission of these sums resulted in an under-

statement of partnership income and in deficiencies in the income tax returns of each of the partners. In computing the deficiencies, the Commissioner calculated the total amount of trust earnings attributable to employees' accounts in the retirement plan, and allocated this sum among the partners according to their distributive shares of partnership income. The theory of this assessment, apparently, is that the payments into the plan by Kaiser in favor of employees of Permanente relieved the partnership of an expense that it might otherwise have undertaken and thus created additional income. With regard to each partner's own tentative account in the retirement plan, the Commissioner treated the "unit" allocations as a modification of the distribution provisions in the partnership agreement and assessed each partner for the annual increment attributable to his own account.[1]

The taxpayers do not contend that the payments into the trust by Kaiser should never be taxed, but they do disagree with the Commissioner as to *when* the tax ought to be imposed and upon *whom*. Because of the substantial possibility of forfeiture of the right to receive the amounts allocated to the tentative accounts,[2] taxpayers argue, there is no current realization of income to the individual partners and taxation should be postponed until the right of receipt has become fixed. The government, on the other hand, prefers to tax now and to treat the amount on which the tax is paid as an addition to each partner's basis in his respective partnership share. Should a partner subsequently forfeit the amount in his tentative account, he

would get a capital loss for that which was taxed earlier as ordinary income.[3]

This case thus presents the question whether the payments by Kaiser into the retirement trust were income realized by the taxpayers in the years in which the payments were made. We hold first that, viewing the taxpayers solely in their individual capacities as participants in the retirement plan, there is no current realization of taxable income. The amounts allocated to the tentative accounts are completely contingent and forfeitable; when payments are made to the trust, it is not possible to determine just who among the participants will ever receive the amount in his tentative account or by how much his account will have been augmented by forfeitures of other participants at the time of receipt. Taxpayers have not constructively received the amounts allocated to their tentative accounts, because they have never had a right to immediate receipt of the payments and they have exercised no control over their disposition. The payments were made solely to fund the trust. Had a participant elected not to join the plan, he could not have received his allocable share as current income in lieu of payments into the trust. Finally, because the tentative accounts cannot be transferred or assigned and are completely forfeitable, the payments into the trust confer no immediate economic benefit upon the participants. *Cf.* Commissioner of Internal Revenue v. LoBue, 1956, 351 U.S. 243, 249, 76 S.Ct. 800, 100 L.Ed. 1142.

For these reasons we conclude that had the taxpayers contracted individual-

---

1. The district court's decision that the interest on the trust corpus is taxable to the trust is not contested on this appeal.

2. During the years 1960–1963, twenty-three physicians forfeited tentative accounts totaling in excess of $60 thousand.

3. In the trial court, the government took the position that a forfeiture gave rise

to an ordinary loss deduction in the year of forfeiture equal to the entire amount of tentative accruals on which the tax had been paid in earlier years. Each remaining participant then had ordinary income in the amount his account was augmented by the forfeiture. Perhaps recognizing the bureaucratic nightmare thus created, the government has now changed its position.

ly with Kaiser for payments into a retirement trust subject to the same conditions involved here, they would not be subject to taxation in the years the payments were made. This conclusion accords with the decisions of both the courts and the Internal Revenue Service holding that payments made into deferred compensation plans which include substantial forfeiture provisions are not taxable until actually received or otherwise made available to the taxpayer, even though not qualifying for special treatment under §§ 401–404 of the Internal Revenue Code. See Drysdale v. Commissioner of Internal Revenue, 6 Cir., 1960, 277 F.2d 413; Schaefer v. Bowers, 2 Cir., 1931, 50 F.2d 689; Harold G. Perkins, 1947, 8 T.C. 1051; Julian Robertson, 1946, 6 T.C. 1060; Rev. Rul. 67–449, 1967–2 Cum.Bull. 173.[4]

The government does not contend that those cases were incorrectly decided but argues instead that because the taxpayers here chose to do business as partners rather than as individuals, the tax result is different. A partnership as such is not subject to the income tax. Int.Rev. Code of 1954, § 701. A partnership is required to report its income, however, and the partners are separately taxable upon their distributive share of partnership net income whether or not such share was actually distributed to them. Int.Rev.Code of 1954, § 702(a); Treas. Reg. § 1.702–1(a) (1956); Heiner v. Mellon, 1938, 304 U.S. 271, 281, 58 S.Ct. 926, 82 L.Ed. 1337. The government argues that the payments into the retirement trust were undistributed partnership income and are thus taxable to each partner according to his proportionate share represented by his tentative account allocation.

The government's argument really involves two steps. First, the government argues, taxability of partnership income is to be determined at the partnership level (the "entity" approach). The taxpayers counter by arguing that taxability of partnership income is to be determined by ignoring the partnership and treating the individual partners as if they had engaged directly in the transaction in question (the "conduit" approach).[5] We assume, without deciding, that taxability is determined at the partnership level. But there is a second step to the government's argument: the partnership has realized taxable income. We hold that in this case it has not.

Section 703(a) of the Code, in relevant part, provides that "[t]he taxable income of a partnership shall be computed in the same manner as in the case of an individual. * * *" Thus we apply the same realization rules to the partnership that we would apply to an individual. During oral argument, government counsel, citing Lucas v. Earl, 1930, 281 U.S. 111, 50 S.Ct. 241, 74 L. Ed. 731, and Hulbert v. Commissioner of Internal Revenue, 7 Cir., 1955, 227 F.2d 399, relied principally upon a diversion of income theory. The Supreme Court in Helvering v. Horst, 1940, 311 U.S. 112, 61 S.Ct. 144, 85 L.Ed. 75, explained the diversion of income theory as follows:

"[T]he rule that income is not taxable until realized has never been taken to

---

4. Some of the authorities cited antedate the deferred compensation provisions of the 1954 Code. Nevertheless, the same realization rules apply to a post-1954, non-qualifying plan as apply to a pre-1954 plan.

5. The district court adopted the "conduit" approach. Because we hold that neither the partnership as an entity nor the partners as individuals realized taxable in-

come, we find it unnecessary to choose between the "entity" and "conduit" approaches, and this opinion is not to be read as adopting either of them.

For a discussion of the general problem of characterization of partnership income see Wolfman, Level for Determining Character of Partnership Income— "Entity" v. "Conduit" Principle in Partnership Taxation, 19 N.Y.U. Institute on Federal Taxation 287 (1961).

mean that the taxpayer, even on the cash receipts basis, who has fully enjoyed the benefit of the economic gain represented by his right to receive income, can escape taxation because he has not himself received payment of it from his obligor. * * * The question * * * is, whether because one who in fact receives payment for services * * * is taxable only on his receipt of the payments, he can escape all tax by giving away his right to income in advance of payment. If the taxpayer procures payment directly to his creditors of the items of interest or earnings due him * * * or if he sets up a revocable trust with income payable to the objects of his bounty, * * * he does not escape taxation because he did not actually receive the money.

"[I]ncome is 'realized' by the assignor because he, who owns or controls the source of the income, also controls the disposition of that which he could have received himself and diverts the payment from himself to others as the means of procuring the satisfaction of his wants." *Id.* at 116–117, 61 S.Ct. at 146. (footnotes omitted).

In *Lucas, supra,* the taxpayer contracted with his wife to receive all earnings of either of them as joint tenants. The Court held that the taxpayer could be taxed on the whole of his salaries and fees earned by him during the tax years in question. *Hulbert, supra,* involved the sale of a partnership business with the provision that the sellers were to continue to operate the business until the date of consummation of the agreement and that one-half of the net profits during that period be paid directly to the buyer and the other half be retained by the sellers and applied against the purchase price. The court, holding the sellers liable for income tax on the entire amount of profits earned during the interim period, stated, "[t]he power to dispose of income is the equivalent of ownership of it and the exercise of the

power to procure its payment to another is within the reach of the statute taxing income." Hulbert v. Commissioner of Internal Revenue, *supra,* 227 F.2d at 401. The government argues that *Lucas* and *Hulbert* control this case because Permanente earned the trust payments as compensation for medical services, because the payments, from Kaiser's standpoint, were irrevocable and unconditional, and because Permanente, by contracting that the payments be made into the retirement plan, directed their disposition.

■ There is, however, a crucial element present in both *Lucas* and *Hulbert* that is missing here. Permanente never had the right itself to receive the payments made into the trust as current income. In *Lucas* the taxpayer had the right to receive his salary and fees and would have received them but for the anticipatory contract with his wife. Likewise, in *Hulbert,* the partnership, had it chosen not to enter the sale agreement or had it entered one under different terms as to the disposition of interim profits, would have received the whole of interim earnings as current income. In this case the parties stipulated that "[t]he payments which [Kaiser] agreed to, and did make to the trust, were paid solely to fund the retirement plan, and were not otherwise available to [Permanente] or to the individual members or employees thereof." Furthermore, the Medical Service Agreement between Permanente and Kaiser provides that in the event Permanente establishes a retirement plan approved by Kaiser, Kaiser's contributions to the plan are to be *in addition* to all other sums payable by Kaiser. Thus, had Permanente elected not to establish the retirement plan, it could not have received additional current income. Nor is there any evidence in the record to suggest that Permanente agreed to accept less direct compensation from Kaiser in exchange for the retirement plan pay-

ments. That Kaiser would not have been willing to make the payments except into the trust under the conditions imposed is consistent with the primary purpose of the retirement plan: to insure Kaiser a stable and reliable group of physicians. The payments are to be viewed not as compensation for immediately past medical services but as compensation for the continued, long-term services of individual physicians. When the transaction is viewed in this light, the partnership becomes a mere agent contracting on behalf of its members for payments to the trust for their ultimate benefit, rather than a principal which itself realizes taxable income. We therefore conclude that Permanente, never having had the right to receive the income, could not have diverted it to others. Permanente's election to account for income on the accrual basis does not alter the result. A right that could never have attached could never have accrued. *Cf.* North American Oil Consolidated v. Burnet, 1932, 286 U.S. 417, 423, 52 S.Ct. 613, 76 L.Ed. 1197.

The foregoing discussion of the government's diversion of income theory is based upon the assumption that the government's "entity" theory as to the taxation of partnership income is correct, an assumption which we make but do not necessarily adopt. If on the other hand, the taxpayers' "conduit" theory were adopted, the same result would be reached. The individual partners did not divert income owing to them to the trust any more than the partnership did. Had there been such a diversion, it may well be that the members of the partnership would each be taxable on their share of the diverted income without regard as to whether the "entity" theory or the "conduit" theory is the correct one.

Because the taxpayers, whether viewed as individuals or as partners, realized no income in the years the payments were made to the trust, we affirm the district court's decision that they cannot now be taxed.

Affirmed.