UNITED STATES *v.* BASYE ET AL.

No. 71–1022.  Argued December 11, 1972—
Decided February 27, 1973

POWELL, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, STEWART, WHITE, MARSHALL, BLACKMUN, and REHNQUIST, JJ., joined.  DOUGLAS, J., dissented.

*Solicitor General Griswold* argued the cause for the United States.  With him on the briefs were *Assistant*

Attorney General *Crampton,* Richard B. Stone, Meyer Rothwacks, and *Ernest J. Brown.*

*Valentine Brookes* argued the cause for respondents. With him on the brief were *Leonard A. Marcussen,* and *Lawrence V. Brookes.**

MR. JUSTICE POWELL delivered the opinion of the Court.

This is a partnership income tax case brought here by the United States on a petition for writ of certiorari from the Court of Appeals for the Ninth Circuit. Respondents, physicians and partners in a medical partnership, filed suit in the District Court for the Northern District of California seeking the refund of income taxes previously paid pursuant to a deficiency assessed by the Commissioner of Internal Revenue. The case was heard on an agreed statement of facts and the District Court ruled in respondents' favor. 295 F. Supp. 1289 (1968). The Government appealed to the Ninth Circuit and that court affirmed the lower court's judgment. 450 F. 2d 109 (1971). We agreed to hear this case to consider whether, as the Government contends, the decision below is in conflict with precedents of this Court. 405 U. S. 1039 (1972). Because we find that the decision is incompatible with basic principles of income taxation as developed in our prior cases, we reverse.

I

Respondents, each of whom is a physician,[1] are partners in a limited partnership known as Permanente

---

*George E. Link* filed a brief for Kaiser Foundation Health Plan, Inc., as *amicus curiae* urging affirmance.

[1] Technically, the married respondents' spouses are also parties because they filed joint income tax returns for the years in question here. Any reference to respondents in this opinion, however, refers only to the partner physicians.

Medical Group, which was organized in California in 1949. Associated with the partnership are over 200 partner physicians, as well as numerous nonpartner physicians and other employees. In 1959, Permanente entered into an agreement with Kaiser Foundation Health Plan, Inc., a nonprofit corporation providing prepaid medical care and hospital services to its dues-paying members.

Pursuant to the terms of the agreement, Permanente agreed to supply medical services for the 390,000 member-families, or about 900,000 individuals, in Kaiser's Northern California Region which covers primarily the San Francisco Bay area. In exchange for those services, Kaiser agreed to pay the partnership a "base compensation" composed of two elements. First, Kaiser undertook to pay directly to the partnership a sum each month computed on the basis of the total number of members enrolled in the health program. That number was multiplied by a stated fee, which originally was set at a little over $2.60. The second item of compensation—and the one that has occasioned the present dispute—called for the creation of a program, funded entirely by Kaiser, to pay retirement benefits to Permanente's partner and nonpartner physicians.

The pertinent compensation provision of the agreement did not itself establish the details of the retirement program; it simply obligated Kaiser to make contributions to such a program in the event that the parties might thereafter agree to adopt one.[2] As might be expected, a separate trust agreement establishing the con-

---

[2] The pertinent portion of the Kaiser-Permanente medical service contract states:

"Article H
"*Base Compensation to Medical Group*
"As base compensation to [Permanente] for Medical Services to

templated plan soon was executed by Permanente, Kaiser, and the Bank of America Trust and Savings Association, acting as trustee. Under this agreement Kaiser agreed to make payments to the trust at a predetermined rate, initially pegged at 12 cents per health plan member per month. Additionally, Kaiser made a flat payment of $200,000 to start the fund and agreed that its pro rata payment obligation would be retroactive to the date of the signing of the medical service agreement.

The beneficiaries of the trust were all partner and nonpartner physicians who had completed at least two years of continuous service with the partnership and who elected to participate. The trust maintained a separate tentative account for each beneficiary. As periodic payments were received from Kaiser, the funds were allocated among these accounts pursuant to a complicated formula designed to take into consideration on a relative basis each participant's compensation level, length of service, and age. No physician was eligible to receive the amounts in his tentative account prior to retirement, and retirement established entitlement only if the participant had rendered at least 15 years of continuous service or 10 years of continuous service and had attained age 65. Prior to such time, however, the trust agreement explicitly provided that no interest in any tentative account was to be regarded as having vested in any par-

be provided by [Permanente] hereunder, [Kaiser] shall pay to [Permanente] the amounts specified in this Article H.

. . . . .

*"Section H–4. Provision for Savings and Retirement Program for Physicians.*

"In the event that [Permanente] establishes a savings and retirement plan or other deferred compensation plan approved by [Kaiser], [Kaiser] will pay, in addition to all other sums payable by [Kaiser] under this Agreement, the contributions required under such plan to the extent that such contributions exceed amounts, if any, contributed by Physicians . . . ."

ticular beneficiary.[3] The agreement also provided for
the forfeiture of any physician's interest and its redis-
tribution among the remaining participants if he were
to terminate his relationship with Permanente prior to
retirement.[4] A similar forfeiture and redistribution also
would occur if, after retirement, a physician were to
render professional services for any hospital or health
plan other than one operated by Kaiser. The trust
agreement further stipulated that a retired physician's
right to receive benefits would cease if he were to refuse
any reasonable request to render consultative services to
any Kaiser-operated health plan.

The agreement provided that the plan would continue
irrespective either of changes in the partnership's per-
sonnel or of alterations in its organizational structure.
The plan would survive any reorganization of the part-
nership so long as at least 50% of the plan's participants
remained associated with the reorganized entity. In the
event of dissolution or of a nonqualifying reorganization,
all of the amounts in the trust were to be divided among
the participants entitled thereto in amounts governed by
each participant's tentative account. Under no circum-
stances, however, could payments from Kaiser to the
trust be recouped by Kaiser: once compensation was
paid into the trust it was thereafter committed exclu-

---

[3] The trust agreement states:

"The tentative accounts and suspended tentative accounts provided
for Participants hereunder are solely for the purpose of facilitating
record keeping and necessary computations, and confer no rights
in the trust fund upon the individuals for whom they are
established. . . ."

[4] If, however, termination were occasioned by death or permanent
disability, the trust agreement provided for receipt of such amounts
as had accumulated in that physician's tentative account. Addi-
tionally, if, after his termination for reasons of disability prior to
retirement, a physician should reassociate with some affiliated medical
group his rights as a participant would not be forfeited.

sively to the benefit of Permanente's participating physicians.

Upon the retirement of any partner or eligible nonpartner physician, if he had satisfied each of the requirements for participation, the amount that had accumulated in his tentative account over the years would be applied to the purchase of a retirement income contract. While the program thus provided obvious benefits to Permanente's physicans, it also served Kaiser's interests. By providing attractive deferred benefits for Permanente's staff of professionals, the retirement plan was designed to "create an incentive" for physicians to remain with Permanente and thus "insure" that Kaiser would have a "stable and reliable group of physicians." [5]

During the years from the plan's inception until its discontinuance in 1963, Kaiser paid a total of more than $2,000,000 into the trust. Permanente, however, did not report these payments as income in its partnership returns. Nor did the individual partners include these payments in the computations of their distributive shares of the partnership's taxable income. The Commissioner assessed deficiencies against each partner-respondent for his distributive share of the amount paid by Kaiser. Respondents, after paying the assessments under protest, filed these consolidated suits for refund.

The Commissioner premised his assessment on the conclusion that Kaiser's payments to the trust constituted a form of compensation to the partnership for the services it rendered and therefore was income to the

---

[5] The agreed statement of facts filed by the parties in the District Court states:

"The primary purpose of the retirement plan was to create an incentive for physicians to remain with [Permanente] . . . and thus to insure [Kaiser] that it would have a stable and reliable group of physicians providing medical services to its members with a minimum of turn-over. . . ."

partnership. And, notwithstanding the deflection of those payments to the retirement trust and their current unavailability to the partners, the partners were still taxable on their distributive shares of that compensation. Both the District Court and the Court of Appeals disagreed. They held that the payments to the fund were not income to the partnership because it did not receive them and never had a "right to receive" them. 295 F. Supp., at 1292–1294; 450 F. 2d, at 114–115. They reasoned that the partnership, as an entity, should be disregarded and that each partner should be treated simply as a potential beneficiary of his tentative share of the retirement fund.[6] Viewed in this light, no presently taxable income could be attributed to these cash basis[7] taxpayers because of the contingent and forfeitable nature of the fund allocations. 295 F. Supp., at 1294–1296; 450 F. 2d, at 112.

We hold that the courts below erred and that respondents were properly taxable on the partnership's retirement fund income. This conclusion rests on two familiar principles of income taxation, first, that income is taxed to the party who earns it and that liability may not be avoided through an anticipatory assignment of that income, and, second, that partners are taxable on

---

[6] The Court of Appeals purported not to decide, as the District Court had, whether the partnership should be viewed as an "entity" or as a "conduit." 450 F. 2d 109, 113 n. 5, and 115. Yet, its analysis indicates that it found it proper to disregard the partnership as a separate entity. After explaining its view that Permanente never had a right to receive the payments, the Court of Appeals stated:

"When the transaction is viewed in this light, the partnership becomes a mere *agent* contracting on behalf of its members for payments to the trust for their ultimate benefit, rather than a *principal* which itself realizes taxable income." *Id.*, at 115 (emphasis supplied).

[7] Each respondent reported his income for the years in question on the cash basis. The partnership reported its taxable receipts under the accrual method.

their distributive or proportionate shares of current partnership income irrespective of whether that income is actually distributed to them. The ensuing discussion is simply an application of those principles to the facts of the present case.

## II

Section 703 of the Internal Revenue Code of 1954, insofar as pertinent here, prescribes that "[t]he taxable income of a partnership shall be computed in the same manner as in the case of an individual." 26 U. S. C. § 703 (a). Thus, while the partnership itself pays no taxes, 26 U. S. C. § 701, it must report the income it generates and such income must be calculated in largely the same manner as an individual computes his personal income. For this purpose, then, the partnership is regarded as an independently recognizable entity apart from the aggregate of its partners. Once its income is ascertained and reported, its existence may be disregarded since each partner must pay a tax on a portion of the total income as if the partnership were merely an agent or conduit through which the income passed.[8]

---

[8] There has been a great deal of discussion in the briefs and in the lower court opinions with respect to whether a partnership is to be viewed as an "entity" or as a "conduit." We find ourselves in agreement with the Solicitor General's remark during oral argument when he suggested that "[i]t seems odd that we should still be discussing such things in 1972." Tr. of Oral Arg. 14. The legislative history indicates, and the commentators agree, that partnerships are entities for purposes of calculating and filing informational returns but that they are conduits through which the taxpaying obligation passes to the individual partners in accord with their distributive shares. See, e. g., H. R. Rep. No. 1337, 83d Cong., 2d Sess., 65–66 (1954); S. Rep. No. 1622, 83d Cong., 2d Sess., 89–90 (1954); 6 J. Mertens, Law of Federal Income Taxation § 35.01 (1968); S. Surrey & W. Warren, Federal Income Taxation 1115–1116 (1960); Jackson, Johnson, Surrey, Tenen & Warren, The Internal Revenue Code of 1954: Partnerships, 54 Col. L. Rev. 1183 (1954).

In determining any partner's income, it is first necessary to compute the gross income of the partnership. One of the major sources of gross income, as defined in § 61 (a)(1) of the Code, is "[c]ompensation for services, including fees, commissions, and similar items." 26 U. S. C. § 61 (a)(1). There can be no question that Kaiser's payments to the retirement trust were compensation for services rendered by the partnership under the medical service agreement. These payments constituted an integral part of the employment arrangement. The agreement itself called for two forms of "base compensation" to be paid in exchange for services rendered— direct per-member, per-month payments to the partnership and other, similarly computed, payments to the trust. Nor was the receipt of these payments contingent upon any condition other than continuation of the contractual relationship and the performance of the prescribed medical services. Payments to the trust, much like the direct payments to the partnership, were not forfeitable by the partnership or recoverable by Kaiser upon the happening of any contingency.

Yet the courts below, focusing on the fact that the retirement fund payments were never actually received by the partnership but were contributed directly to the trust, found that the payments were not includable as income in the partnership's returns. The view of tax accountability upon which this conclusion rests is incompatible with a foundational rule, which this Court has described as "the first principle of income taxation: that income must be taxed to him who earns it." *Commissioner* v. *Culbertson*, 337 U. S. 733, 739–740 (1949). The entity earning the income—whether a partnership or an individual taxpayer—cannot avoid taxation by entering into a contractual arrangement whereby that income is diverted to some other person or entity. Such arrangements, known to the tax law as "anticipatory assign-

ments of income," have frequently been held ineffective as means of avoiding tax liability. The seminal precedent, written over 40 years ago, is Mr. Justice Holmes' opinion for a unanimous Court in *Lucas* v. *Earl,* 281 U. S. 111 (1930). There the taxpayer entered into a contract with his wife whereby she became entitled to one-half of any income he might earn in the future. On the belief that a taxpayer was accountable only for income actually received by him, the husband thereafter reported only half of his income. The Court, unwilling to accept that a reasonable construction of the tax laws permitted such easy deflection of income tax liability, held that the taxpayer was responsible for the entire amount of his income.

The basis for the Court's ruling is explicit and controls the case before us today:

> "[T]his case is not to be decided by attenuated subtleties. It turns on the import and reasonable construction of the taxing act. There is no doubt that the statute could tax salaries to those who earned them and provide that the tax could not be escaped by anticipatory arrangements and contracts however skilfully devised to prevent the salary when paid from vesting even for a second in the man who earned it. That seems to us the import of the statute before us and we think that no distinction can be taken according to the motives leading to the arrangement by which the fruits are attributed to a different tree from that on which they grew." *Id.,* at 114–115.

The principle of *Lucas* v. *Earl,* that he who earns income may not avoid taxation through anticipatory arrangements no matter how clever or subtle, has been repeatedly invoked by this Court and stands today as a cornerstone of our graduated income tax system. See, *e. g., Commissioner* v. *Harmon,* 323 U. S. 44 (1944);

*United States* v. *Joliet & Chicago R. Co.,* 315 U. S. 44 (1942); *Helvering* v. *Eubank,* 311 U. S. 122 (1940); *Burnet* v. *Leininger,* 285 U. S. 136 (1932). And, of course, that principle applies with equal force in assessing partnership income.

Permanente's agreement with Kaiser, whereby a portion of the partnership compensation was deflected to the retirement fund, is certainly within the ambit of *Lucas* v. *Earl.* The partnership earned the income and, as a result of arm's-length bargaining with Kaiser,[9] was responsible for its diversion into the trust fund. The Court of Appeals found the *Lucas* principle inapplicable because Permanente "never had the right itself to receive the payments made into the trust as current income." 450 F. 2d, at 114. In support of this assertion, the court relied on language in the agreed statement of facts stipulating that "[t]he payments . . . were paid solely to fund the retirement plan, and were not otherwise available to [Permanente] . . . ." *Ibid.* Emphasizing that the fund was created to serve Kaiser's interest in a stable source of qualified, experienced physicians,[10] the court found that Permanente could not have received that income except in the form in which it was received.

The court's reasoning seems to be that, before the partnership could be found to have received income, there must be proof that "Permanente agreed to accept less direct compensation from Kaiser in exchange for the retirement plan payments." *Id.,* at 114–115. Apart from the inherent difficulty of adducing such evidence, we know of no authority imposing this burden upon the Government. Nor do we believe that the guiding principle of *Lucas* v. *Earl* may be so easily circumvented.

[9] The agreed statement of facts states that the contracting parties were "separate organizations independently contracting with one another at arms' length."

[10] See n. 5, *supra.*

Kaiser's motives for making payments are irrelevant to the determination whether those amounts may fairly be viewed as compensation for services rendered.[11]  Neither does Kaiser's apparent insistence upon payment to the trust deprive the agreed contributions of their character as compensation.  The Government need not prove that the taxpayer had complete and unrestricted power to designate the manner and form in which his income is received.  We may assume, especially in view of the relatively unfavorable tax status of self-employed persons with respect to the tax treatment of retirement plans,[12] that many partnerships would eagerly accept conditions similar to those prescribed by this trust in consideration for tax-deferral benefits of the sort suggested here.  We think it clear, however, that the tax laws permit no such easy road to tax avoidance or defer-

---

[11] Respondents do not contend that such payments were gifts or some other type of nontaxable contribution.  See *Commissioner* v. *LoBue*, 351 U. S. 243 (1956); *Bingler* v. *Johnson*, 394 U. S. 741 (1969).

[12] Disparities have long existed between the tax treatment of pension plans for corporate employees and the treatment of similar plans for the self-employed and for members of partnerships. S. Surrey & W. Warren, *supra*, n. 8, at 598–599.  In 1962, Congress endeavored to ameliorate these differences by enacting corrective legislation, Pub. L. 87–792, 76 Stat. 809.  While that legislation, commonly known as H. R. 10 or the Jenkins-Keogh Bill, provided some relief, it fell far short of affording a parity of treatment for professionals and other self-employed individuals.  Internal Revenue Code of 1954, § 404.  For a detailed review of the intricate provisions of the applicable statute and for a close comparison of the present differences, see Grayck, Tax Qualified Retirement Plans for Professional Practitioners: A Comparison of the Self-Employed Individuals Tax Requirement Act of 1962 and the Professional Association, 63 Col. L. Rev. 415 (1963); Note, Federal Tax Policy and Retirement Benefits—A New Approach, 59 Geo. L. J. 1299 (1971); Note, Tax Parity for Self-Employed Retirement Plans, 58 Va. L. Rev. 338 (1972).

ment.[13] Despite the novelty and ingenuity of this arrangement, Permanente's "base compensation" in the form of payments to a retirement fund was income to the partnership and should have been reported as such.

## III

Since the retirement fund payments should have been reported as income to the partnership, along with other income received from Kaiser, the individual partners should have included their shares of that income in their individual returns. 26 U. S. C. §§ 61 (a)(13), 702, 704. For it is axiomatic that each partner must pay taxes on his distributive share of the partnership's income without regard to whether that amount is actually distributed to him. *Heiner* v. *Mellon,* 304 U. S. 271 (1938), decided under a predecessor to the current partnership provisions of the Code,[14] articulates the salient proposi-

[13] Respondents contend in this Court that this case is controlled by *Commissioner* v. *First Security Bank of Utah,* 405 U. S. 394 (1972), decided last Term. We held there that the Commissioner could not properly allocate income to one of a controlled group of corporations under 26 U. S. C. § 482 where that corporation could not have received that income as a matter of law. The "assignment-of-income doctrine" could have no application in that peculiar circumstance because the taxpayer had no legal right to receive the income in question. *Id.,* at 403–404. In essence, that case involved a deflection of income imposed by law, not an assignment arrived at by the consensual agreement of two parties acting at arm's length as we have in the present case. See n. 5, *supra.*

[14] Revenue Act of 1918, § 218 (a), 40 Stat. 1070:

"There shall be included in computing the net income of each partner his distributive share, whether distributed or not, of the net income of the partnership for the taxable year . . . ."

Other predecessor statutes ·contained similar explicit indications that a partner's distributive share was to be computed without reference to actual distribution. See Income Tax Act of 1913, § II D, 38 Stat. 169 ("whether divided or otherwise"); Revenue Act of 1938, § 182, 52 Stat. 521 ("whether or not distribution is made to

tion.  After concluding that "distributive" share means the "proportionate" share as determined by the partnership agreement, *id.*, at 280, the Court stated:

> "The tax is thus imposed upon the partner's proportionate share of the net income of the partnership, and the fact that it may not be currently distributable, whether by agreement of the parties or by operation of law, is not material." *Id.*, at 281.

Few principles of partnership taxation are more firmly established than that no matter the reason for nondistribution each partner must pay taxes on his distributive share.  Treas. Reg. § 1.702–1, 26 CFR § 1.702–1 (1972).[15] See, *e. g., Hulbert v. Commissioner,* 227 F. 2d 399 (CA7 1955); *Bell v. Commissioner,* 219 F. 2d 442 (CA5 1955); *Stewart v. United States,* 263 F. Supp. 451 (SDNY 1967); *Freudmann v. Commissioner,* 10 T. C. 775 (1948); S. Surrey & W. Warren, Federal Income Taxation 1115 (1960); 6 J. Mertens, Law of Federal Income Taxation §§ 35.01, 35.22 (1968); A. Willis, On Partnership Taxation § 5.01 (1971).

The courts below reasoned to the contrary, holding that the partners here were not properly taxable on the amounts contributed to the retirement fund.  This view, apparently, was based on the assumption that each partner's distributive share prior to retirement was too con-

---

him").  Nothing in the legislative history suggests that any substantive change was intended by the deletion of this phrase from the 1954 Code revisions.  See H. R. Rep. No. 1337, 83d Cong., 2d Sess., 65 (1954); S. Rep. No. 1622, 83d Cong., 2d Sess., 89 (1954).

[15] The regulation states as follows:

"Each partner is required to take into account separately in his return his distributive share, whether or not distributed, of each class or item of partnership income . . . ."

tingent and unascertainable to constitute presently recognizable income. It is true that no partner knew with certainty exactly how much he would ultimately receive or whether he would in fact be entitled to receive anything. But the existence of conditions upon the actual receipt by a partner of income fully earned by the partnership is irrelevant in determining the amount of tax due from him. The fact that the courts below placed such emphasis on this factor suggests the basic misapprehension under which they labored in this case. Rather than being viewed as responsible contributors to the partnership's total income, respondent-partners were seen only as contingent beneficiaries of the trust. In some measure, this misplaced focus on the considerations of uncertainty and forfeitability may be a consequence of the erroneous manner in which the Commissioner originally assessed the partners' deficiencies. The Commissioner divided Kaiser's trust fund payments into two categories: (1) payments earmarked for the tentative accounts of *nonpartner* physicians; and (2) those allotted to *partner* physicians. The payments to the trust for the former category of nonpartner physicians were correctly counted as income to the partners in accord with the distributive-share formula as established in the partnership agreement.[16] The latter payments to the tentative accounts of the individual partners, however, were improperly allocated to each partner pursuant to the complex formula in the retirement plan itself, just as if that agreement operated as an amendment to the partnership agreement. 295 F. Supp., at 1292.

---

[16] These amounts would be divided equally among the partners pursuant to the partnership agreement's stipulation that all income above each partner's drawing account "shall be distributed equally."

The Solicitor General, alluding to this miscomputation during oral argument, suggested that this error "may be what threw the court below off the track." [17] It should be clear that the contingent and unascertainable nature of each partner's share under the retirement trust is irrelevant to the computation of his distributive share. The partnership had received as income a definite sum which was not subject to diminution or forfeiture. Only its ultimate disposition among the employees and partners remained uncertain. For purposes of income tax computation it made no difference that some partners might have elected not to participate in the retirement program or that, for any number of reasons, they might not ultimately receive any of the trust's benefits. Indeed, as the Government suggests, the result would be quite the same if the "potential beneficiaries included no partners at all, but were children, relatives, or other objects of the partnership's largesse." [18] The sole operative consideration is that the income had been received by the partnership, not what disposition might have been effected once the funds were received.

---

[17] Tr. of Oral Arg. 13–14. As the Solicitor General has also pointed out, the parties have, by stipulation in their agreed statement of facts, foreseen that recomputations might be necessary in light of the ultimate resolution of this controversy and have taken precautions to assure that any necessary reallocations may be handled expeditiously. Agreed Statement of Facts ¶ 24, App. 87–88.

[18] Brief for United States 21. For this reason, the cases relied on by the Court of Appeals, 450 F. 2d, at 113, which have held that payments made into deferred compensation programs having contingent and forfeitable features are not taxable until received, are inapposite. *Schaefer* v. *Bowers,* 50 F. 2d 689 (CA2 1931); *Perkins* v. *Commissioner,* 8 T. C. 1051 (1947); *Robertson* v. *Commissioner,* 6 T. C. 1060 (1946). Indeed, the Government notes, possibly as a consequence of these cases, that the Commissioner has not sought to tax the *nonpartner* physicians on their contingent accounts under the retirement plan. Brief for United States 21.

## IV

In summary, we find this case controlled by familiar and long-settled principles of income and partnership taxation. There being no doubt about the character of the payments as compensation, or about their actual receipt, the partnership was obligated to report them as income presently received. Likewise, each partner was responsible for his distributive share of that income. We, therefore, reverse the judgments and remand the case with directions that judgments be entered for the United States.

*It is so ordered.*

MR. JUSTICE DOUGLAS dissents.