**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**
No. 95-60696

TEXACO, INC. and SUBSIDIARIES,

Petitioner-Appellee,

VERSUS

COMMISSIONER OF INTERNAL REVENUE,

Respondent-Appellant.

_____

Appeal from the United States Tax Court

_____

October 17, 1996

Before DAVIS, JONES and EMILIO M. GARZA, Circuit Judges.

DAVIS, Circuit Judge:

The Commissioner of Internal Revenue challenges the Tax Court's legal conclusion that Letter 103/z, a 1979 pronouncement of Saudi Arabian oil policy by the Saudi Arabian Oil Minister, prohibits the Commissioner from exercising her authority to reallocate income under 26 U.S.C. §§ 482 and 61 (1994).  We affirm.

I.

Texaco, Inc. is the parent corporation of a group of entities engaged in the production, refining, transportation, and marketing of crude oil and refined products in the United States and abroad.  Texaco has a number of subsidiary/affiliate corporations under its umbrella.  One of those affiliates is Texaco International Trader, Inc. (Textrad), which acted as the international trading company for the worldwide

Texaco refining and marketing system during the period in question. As the trading company, Textrad purchased Saudi crude oil from the Saudi government by way of the Arabian American Oil Company (Aramco) and resold that crude to both affiliates and unrelated customers.

The Commissioner contends that Textrad unduly shifted profits to its foreign affiliates during taxable years 1979-81, and she increased Textrad's U.S. taxable income for those years under §§ 482[1] and 61 of the Internal Revenue Code to reflect those profits. Texaco argues that it had no power to control the allocation of profits on Saudi Oil during those years because of the restrictions imposed by Letter 103/z, which required Texaco and the other Aramco members to re-sell Saudi Arabian crude at specified below market prices. The Tax Court conducted a lengthy trial and entered detailed findings of fact, which we need not repeat here. We state only those facts necessary to understand our opinion.

A.

From early 1979 through late 1981, Saudi Arabia permitted Texaco and the other Aramco participants to buy Saudi Arabian crude oil at below market prices. The Saudi government also established the

---

[1]  26 U.S.C. § 482 (1994) states:

In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any such organizations, trades, or businesses.

official selling price (the OSP) for Saudi Arabian crude below the market price. The Saudi government took these actions in response to requests by the United States and other consuming countries to moderate the price of crude oil. To ensure its price regulation had its intended effect, the Saudi government prohibited Texaco and other participants in Aramco from re-selling Saudi crude at prices higher than the OSP. As the Tax Court found, these restrictions were authorized by the King and communicated to Aramco by Minister Yamani in Letter 103/z, dated January 23, 1979.[2] Except in instances where it was excused from doing so, Textrad complied with Letter 103/z and resold the Saudi crude at the OSP.

During the period in question, Textrad sold approximately 34 percent of its Saudi crude or about 780,000,000 barrels to its refining affiliates. Of these, approximately 275,000,000 barrels were sold to Texaco's domestic refining company and 505,000,000 barrels to Texaco's foreign refining affiliates.[3] Textrad also sold 15-20 percent of its Saudi oil at the below market OSP to customers that were completely unrelated to Texaco. This was consistent with the pattern and volume of Textrad's sales to unrelated customers in earlier years. Moreover, the Tax Court specifically found that any changes in Textrad's sales to both its affiliates and its unrelated customers during this period were not related to the Saudi price restrictions.

---

[2] Paragraph 5 of Letter 103/z required Texaco and the other Aramco participants "to pledge that they will not sell to a third party at prices in excess of what we have specified herein."

[3] Any profits made by Texaco's domestic affiliates from the sale of products refined from this oil were included in Texaco's United States taxable income.

3

The restrictions in Letter 103/z, however, applied only to Saudi crude, not to the sale of products refined from Saudi crude. As a result, the companies that bought Saudi crude from Textrad at the below market OSP, including Texaco's refining affiliates, earned large profits from the sale of refined products. Unlike its domestic affiliates, Texaco's foreign refining affiliates reported no taxable income in the United States.

B.

The commissioner alleges that Textrad shifted profits attributable to the lower cost of Saudi crude out of Texaco's U.S. taxable income when it sold Saudi crude at the OSP to its foreign refining affiliates. The Commissioner reallocated over $1.7 billion in income to Textrad for taxable years 1979, 1980, and 1981. Following a five-week trial, the Tax Court issued a detailed opinion. The Tax Court held that the Commissioner was precluded from allocating income to Texaco under §§ 482 and 61 because the price restrictions in Letter 103/z were the "virtual equivalent of law," which Texaco was required to obey.

The Tax Court supported this conclusion with a number of factual findings, including the following:

1. The Saudi government, with the approval of the King, issued Letter 103/z prohibiting the resale of Saudi crude at amounts exceeding the OSP.

2. Texaco was subject to that restriction and faced severe economic repercussions, including loss of its supply of Saudi crude and confiscation of its assets, if it violated Letter 103/z.

3. This mandatory price restriction applied to all sales of Saudi

4

crude, including sales to affiliated entities.

4. Neither Texaco nor any other Aramco participant had any power to negotiate or alter the terms of this restriction.

Based on its findings that Texaco was obligated to comply, and did comply, with the Saudi government's price restrictions, the Tax Court concluded that Texaco's pricing policy to its foreign affiliates as well as its unrelated customers was due to these restrictions and not to any attempt to distort its true income for tax purposes. The Commissioner has appealed the order disallowing the allocation.

II.

A.

Based on the Tax Court's factual findings, which are not clearly erroneous, we agree that Letter 103/z had the effect of a legal restriction in Saudi Arabia. The 1979 pricing requirements were authorized by the King and issued by Minister Yamani on behalf of the Saudi government as mandatory restrictions. These restrictions applied to all sales of Saudi crude by the Aramco participants and others. The restrictions were in effect during the period at issue and were followed by Texaco. The Tax Court's findings of fact fully support its conclusion that Letter 103/z should be given the effect of law for purposes of §§ 482 and 61.

We also agree with the Tax Court's legal conclusion that the teaching of Commissioner v. First Security Bank, 405 U.S. 394 (1972), bars the Commissioner from allocating income to Textrad on its sales of Saudi crude under § 482. Because the sales price of the crude is governed by Letter 103/z, Texaco did not have the power to control the

5

sales price of the oil.

Section 482 of the Internal Revenue Code authorizes the Secretary to apportion or allocate income between organizations controlled by the same interests "if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any such organizations . . . ." 26 U.S.C. § 482. The relevant IRS regulation explains that the purpose of § 482 is "to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer" and to ensure that controlling entities conduct their subsidiaries' transactions in such a way as to reflect the "true taxable income" of each controlled taxpayer. 26 C.F.R. § 1.482-1(b)(1) (1996).[4] The regulation further explains that "[t]he standard to be applied in every case is that of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer." Id.

_____

[4] 26 C.F.R. § 1.482-1(b)(1) reads in full:

The purpose of section 482 is to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer, by determining, according to the standard of an uncontrolled taxpayer, the true taxable income from the property and business of a controlled taxpayer. The interests controlling a group of controlled taxpayers are assumed to have complete power to cause each controlled taxpayer so to conduct its affairs that its transactions and accounting records truly reflect the taxable income from the property and business of each of the controlled taxpayers. If, however, this has not been done, and the taxable incomes are thereby understated, the district director shall intervene, and, by making such distributions, apportionments, or allocations as he may deem necessary of gross income, deductions, credits, or allowances, or of any item or element affecting taxable income, between or among the controlled taxpayers constituting the group, shall determine the true taxable income of each controlled taxpayer. the standard to be applied in every case is that of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer.

In First Security, the Court held that § 482 did not authorize the Commissioner to allocate income to a party prohibited by law from receiving it. 405 U.S. at 404. In that case, two related banks offered credit life insurance to their customers. Federal law prohibited the banks from acting as insurance agents and receiving premiums or commissions on the sale of insurance. The banks referred their customers to an unrelated insurance company to purchase this insurance. The insurance company retained a small percent of the premiums for administrative services and transferred the bulk of the premiums through a reinsurance agreement to an insurance company affiliated with the banks, which reported all of the reinsurance premiums it received as income. The Commissioner reallocated 40% of the related insurance company's income from these reinsurance premiums to the banks as compensation for originating and referring the insurance business. Id. at 396-99.

The Court concluded that due to the restrictions of federal banking law, the holding company that controlled the banks and the insurance affiliate did not have the power to shift income among its subsidiaries. In so holding, the Court emphasized that the Commissioner's authority to allocate income under § 482 presupposes that the taxpayer has the power to control its income: "The underlying assumption always has been that in order to be taxed for income, a taxpayer must have complete dominion over it." Id. at 403. Indeed, as the Court noted, the Commissioner's own regulations for implementing § 482 contemplate that the controlling interest "must have 'complete power' to shift income among its subsidiaries." Id. at 404-05 (quoting

7

26 C.F.R. § 1.482-1(b)(1) (1971)).

Moreover, the regulations and First Security make clear that this standard is not limited to cases where the government contends the taxpayer attempted to evade taxes. Rather, the Court explicitly extends its reasoning to circumstances where the government contends that the organization's "true taxable income" has not been reflected.[5] After explaining that the right to control the allocation of income is critical, the Court stated: "It is only where this power exists, and has been exercised in such a way that the 'true, taxable income' of a subsidiary has been understated, that the Commissioner is authorized to reallocate under § 482. . . . The 'complete power' referred to in the regulations hardly includes the power to force a subsidiary to violate the law." Id. (emphasis added). Because the holding company in First Security could not have allocated the income to the banks unless it acted in violation of the law, the Court concluded that the banks' true income was not understated and the Commissioner's allocation under § 482 was improper.

---

[5] We find no indication from the facts and contentions of the parties in First Security that the government contended that the banks or the holding company sought to evade taxes. Rather, First Security explains in general terms the type case § 482 is designed to reach without distinguishing between claims of evasion and other claims that the true income of the taxpayer has not been reflected: "The question we must answer is whether there was a shifting or distorting of the [taxpayers] true net income." Id. at 400-401 (emphasis added); see also id. at 407 (concluding that because the holding company "did not utilize its control over the [banks and the affiliated insurance company] to distort their true net incomes," the Commissioner could not exercise his § 482 authority) (emphasis added). This is consistent with the approach and structure of the regulation, which also does not distinguish between evasion and other conduct that fails to reflect the true taxable income of the taxpayer. See 26 C.F.R. § 1.482(b)(1) (1996).

The Sixth Circuit decision in Procter & Gamble Co. v. Commissioner, 961 F.2d 1255 (6th Cir 1992) also supports the Tax Court's conclusion. In that case, the court held that a Spanish law prohibiting a foreign affiliate from paying royalties for the use of patents was sufficient to preclude the Commissioner from reallocating income to account for a reasonable royalty. The court stated that "the purpose of § 482 is to prevent artificial shifting of income between related taxpayers." Id. at 1259 (emphasis added). Again the deciding issue was one of control: "Because Spanish law prohibited royalty payments, [the controlling company] could not exercise the control that § 482 contemplates, and allocation under § 482 is inappropriate." Id. at 1259. See also L.E. Shunk Latex Products, Inc. v. Commissioner, 18 T.C. 940 (1952) (holding that Commissioner could not allocate additional income to condom manufacturer where manufacturer sold condoms to its affiliate at price set by Office of Price Administration, even though affiliate made substantial profits on the transactions).

It is precisely this ability to control the flow of its income that Texaco lacked. The Tax Court found, and we agree, that Letter 103/z had the force and effect of law, that Textrad was obligated to comply with its requirements, and that it did so comply. Because Textrad lacked the power to sell Saudi crude above the OSP, reallocation under § 482 is inappropriate.

## B.

The Commissioner tries to justify the allocation by analogizing Texaco's conduct to an "assignment of income" and places much reliance

on the Supreme Court's decision in United States v. Basye, 410 U.S. 441 (1973). However, nothing in Basye is contrary to the principles discussed above, and the Commissioner's reliance on this case is misplaced.

In Basye, the Court relied on familiar principles "that income is taxed to the party who earns it and that liability may not be avoided through an anticipatory assignment of that income" to hold that a group of doctors' failure to actually receive a portion of their compensation that was instead placed in a retirement trust did not preclude the Commissioner from allocating that income to them. Id. at 457. The Court found that the sole reason the doctors could not receive the challenged portion of their income was because their medical partnership had agreed with a health plan foundation to service the foundation's members for free in exchange for contributions to a retirement trust. Id. at 449.

The Court's holding in Basye turned on the consensual nature of the agreement and is entirely consistent with the principles of control expressed in the regulations adopted under § 482 and in First Security. As the regulations make clear, the goal of inquiring into the transactions of controlled taxpayers under § 482 is "to ascertain whether the common control is being used to reduce, avoid or escape taxes." 26 C.F.R. § 1.482-1(c) (1996). The Court in Basye agreed with the Commissioner that the doctors' compensation scheme was entirely voluntary -- that the medical partnership possessed common control and used it to reduce, avoid, or escape taxes. That the doctors exercised that control prior to their actual possession of the income was

10

irrelevant.

But where, as here, the taxpayer lacks the power to control the allocation of the profits, reallocation under § 482 is inappropriate. As stated above, we fully agree with the Tax Court that Letter 103/z deprived Textrad of the power to sell Saudi crude to its foreign refining affiliates for a price that exceeded the OSP. Because Texaco lacked the ability to control the allocation of the income in question, it follows that it could not have used its control to evade taxes or artificially shift its income to its foreign affiliates so that its true taxable income was not reflected.

C.

Nor would the Commissioner's proposed allocation be consistent with § 482's goal of achieving tax parity between controlled and uncontrolled taxpayers. As the First Security Court and the regulations make clear, the "'purpose of § 482 is to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer.'" 405 U.S. at 407 (citing 26 C.F.R. § 1.482-1(b)(1) (1971)). Thus, "[t]he standard to be applied in every case is that of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer." 26 C.F.R. § 1.482-1(b)(1) (1996).

The record evidence fully supports the Tax Court's findings that Textrad sold significant amounts of Saudi crude to unrelated customers at the same OSP it sold to its affiliates, that the volume of Textrad's sales of Saudi crude to unrelated customers during this period remained generally consistent with historic levels, and that any changes in Textrad's sales to its affiliates and its unrelated customers during

11

this period had no nexus with the restrictions imposed by Letter 103/z. Therefore, the Tax Court did not err in concluding that the Commissioner failed to demonstrate any disparity between Texaco's treatment of its affiliates and its unrelated customers as a result of the Saudi price restrictions. Thus, under the regulation's tax parity standard, the Commissioner's allocation of Texaco's income under § 482 is improper.

In sum, the Tax Court did not err in concluding that Textrad sold the Saudi crude to both its affiliates and its unrelated customers at the below market OSP to avoid violating Letter 103/z and the severe economic reprisal that would have flowed from such a violation. Accordingly, the Commissioner had no authority to allocate the income under § 482.

For the reasons stated above, the Tax Court properly concluded that the Commissioner was without authority to reallocate Texaco's income under § 482.

AFFIRMED.

12