MEADOWLAWN MEMORIAL
GARDENS, INC.

v.

The UNITED STATES.

No. 535–77.

United States Court of Claims.

Aug. 13, 1980.

Michael D. Annis, Tampa, Fla., attorney of record, for plaintiff.

James S. Maxwell, Washington, D.C., with whom was Asst. Atty. Gen. M. Carr Ferguson, Washington, D.C., for defendant. Theodore D. Peyser and Donald H. Olson, Washington, D.C., of counsel.

Before NICHOLS, KASHIWA and SMITH, Judges.

## OPINION

PER CURIAM:

This case comes before the court on defendant's motion, filed June 10, 1980, requesting that the court adopt the recommended decision of Trial Judge Robert J. Yock, filed April 9, 1980, pursuant to Rule 134(h), as the basis for its judgment in this case, neither party having filed a notice of intention to except, or exceptions, thereto and the time for so filing pursuant to the Rules of the court having expired. Upon consideration thereof, without oral argument, since the court agrees with the trial judge's recommended decision, as hereinafter set forth *, it hereby grants defendant's motion and affirms and adopts the recommended decision as the basis for its judgment in this case. Accordingly, plaintiff is not entitled to recover, and the petition is dismissed.

## OPINION OF TRIAL JUDGE

YOCK, Trial Judge: This is an action for the recovery of portions of the federal income taxes paid by plaintiff for its two fiscal years ending February 29, 1972 and February 28, 1973, plus interest as provided by law. Jurisdiction is based on 28 U.S.C. § 1491 (1976). The issue in this case is whether or not plaintiff, a for–profit cemetery corporation, is entitled to exclude, deduct, or capitalize certain additional contributions made by it to a care and maintenance (perpetual care) trust fund in excess of the stated amounts required to be so contributed by plaintiff's agreements and/or Florida state law. For the reasons set forth below, it is concluded that plaintiff is not entitled to recover.

## FACTS

Plaintiff, Meadowlawn Memorial Gardens, Inc. (hereinafter Meadowlawn), a Florida cemetery corporation, was formed on March 8, 1965, for the purpose of providing a perpetual care cemetery in Pasco County, Florida.

Under the perpetual care concept, Meadowlawn proposed to forever maintain the cemetery grounds by fertilizing, watering and manicuring the grass, trimming the shrubbery and trees, and otherwise keeping the grounds in a beautiful condition as a proper and respectful resting place for the dead. Meadowlawn's perpetual care plan was, ideally, to continue the maintenance of the cemetery grounds in at least their present condition, and hopefully in an improved condition, as the years went by into perpetuity.

The concept of endowed perpetual care which Meadowlawn adopted meant that a certain portion of the sales price from each cemetery lot, crypt, or niche sold would be placed into a trust fund to provide income to maintain the cemetery not just in the current year, but more specifically and critically for all future years into perpetuity as well.

During the years in question, plaintiff's operations were governed by the Florida Cemetery Act. Fla.Stat. tit. 31, ch. 559 (1971). That Act provided that a cemetery company could not establish or operate a cemetery unless it established a trust fund for the future care and maintenance of the cemetery. Fla.Stat. § 559.41. The Act also provided that basically 10 percent of the payments received for the sale of cemetery lots, crypts and niches were to be set aside and deposited in the care and maintenance trust fund by the cemetery company not

---

* Although the court adopted the trial judge's separate findings of fact, which are set forth in his report, they are not printed herein since such facts as are necessary to the decision are contained in his opinion.

later than 60 days following the close of the calendar month in which the payments were received. Fla.Stat. § 559.43. The Act also provided for state regulation of the cemetery's operation to ensure compliance with the requirements of the Act. Fla.Stat. § 559.41.

In connection with its formation as a cemetery under the Florida Cemetery Act and its desire to provide perpetual care, Meadowlawn executed a Declaration of Trust with the First National Bank of Dunedin as trustee on March 31, 1965, that established the necessary trust fund. The Declaration of Trust provided that Meadowlawn would place in trust at least the amounts required by the Florida Cemetery Act (i. e., basically 10 percent of sales), and that the cemetery reserved the right to contribute more in its own discretion. Pursuant to the terms of the Declaration of Trust, the trust income was required to be distributed to Meadowlawn after deduction of the trustee's administrative expenses.

Meadowlawn uses the perpetual care concept of its cemetery as a major selling point. Since the inception of the cemetery, when a prospective customer discusses the possible purchase of a cemetery lot, crypt, or niche, he is told of the perpetual care aspect of the cemetery. The perpetual care concept of the cemetery is also stressed through advertisements. Moreover, Meadowlawn's salesmen were instructed to and did inform potential customers about the adequacy and size of the care and maintenance trust fund.

Meadowlawn is one of only three cemeteries in the Pasco County, Florida area that offers perpetual care. There are a number of church and municipal cemeteries in the area which do not offer perpetual care. The cemeteries that do not offer perpetual care generally cannot be compared, in appearance, to cemeteries providing such care. Without perpetual care, cemeteries are generally neglected and weed-grown.

While Meadowlawn sought to make prospective purchasers aware of its care and maintenance trust fund, the written documents used in connection with plaintiff's sales are the only evidence of the ultimate understanding reached between those parties with respect to Meadowlawn's perpetual care contractual obligations. The language of the sales agreement used during the taxable years in issue was devoid of any mention of perpetual care or of a care and maintenance trust fund to ensure such care. In addition to the sales agreement (or contract), each customer received a Deed of Sepulchre, a copy of the Rules and Regulations of the Cemetery, and a Certificate of Endowed Care.

The Deed of Sepulchre was also silent on the matter of perpetual care; however, it made the conveyance subject to the rules and regulations of the cemetery. The rules and regulations of the cemetery provided that a trust fund would be maintained for the care and maintenance of the cemetery. The rules also provided, however, that Meadowlawn was "not required to expend for maintenance or repair an amount greater than the net income from the perpetual care trust."

The Certificate of Endowed Care provided only that the subject plot was "entitled to endowed care and maintenance * * * as required by the laws of the State of Florida and the rules and regulations of the Cemetery from time to time in force and effect," and that "a certain portion of the purchase price for the above described plot(s) shall be placed in trust in a permanent endowed care fund, such amount to be no less than that prescribed by the laws of the State of Florida." The Certificate of Endowed Care also provided that the earnings of the trust fund would be used exclusively for beautification, maintenance, and upkeep of the cemetery.

The board of directors of Meadowlawn very early made the policy decision to build the care and maintenance trust fund faster than the 10 percent requirements of the Florida Cemetery Act. Plaintiff had a number of reasons for making additional contributions to its trust fund. Plaintiff wanted to build up a large trust fund as an advertising device in order to better com-

pete for the business of prospective purchasers in the area. Plaintiff also thought that it might be able to obtain certain tax advantages by making the additional contributions to its trust fund. Finally, plaintiff believed that it had a duty to its customers to build up a trust fund which would be adequate to maintain the cemetery in perpetuity and believed that contributing only the amounts required by state law would not necessarily build up a trust fund of sufficient size to accomplish that goal.

When the trust was originated in 1965, 10 percent of all sales of lots, crypts and niches was placed into the care and maintenance trust fund, in conformance with the statutory requirements. However, starting in the fiscal year ending February 1967, Meadowlawn reinvested the earnings of the trust fund back into the trust fund, rather than using those earnings to defray the current maintenance expenses of the cemetery. Amounts so reinvested were additional contributions to the care and maintenance trust fund in excess of the requirements of the Florida Cemetery Act. Also, starting in the fiscal year ending February 1968, Meadowlawn began to make additional year–end, lump–sum contributions to the trust, over and above the 10 percent required by Florida statute and in addition to the amounts of trust income which were reinvested.

In the first fiscal year at issue in this case, the fiscal year ending February 29, 1972, a total of $81,547 was contributed by Meadowlawn to the trust fund. This amount ($81,547) represented a 36.8 percent contribution measured against gross sales of lots, crypts, or niches for the fiscal year. Of this amount, $22,261 represented the statutorily required 10 percent contribution, and the rest was additional contributions. That is, $9,286 of trust earnings were either retained by the trust at the direction of Meadowlawn or recontributed to it by Meadowlawn, and $50,000 represented a year–end, lump–sum contribution made by Meadowlawn pursuant to resolution of the board of directors.

In the second fiscal year at issue, the fiscal year ending February 28, 1973, a total of $105,559 was contributed to the trust fund. This amount ($105,559) represented a 41.1 percent contribution measured against gross sales of lots, crypts and niches for the fiscal year. Of this amount, $25,815 represented the 10 percent statutory contribution, $9,744 represented reinvested trust fund earnings, and $70,000 represented a year–end, lump–sum contribution made pursuant to board resolution.

The additional contributions (reinvested trust earnings and year–end, lump–sum contributions) made by Meadowlawn in both of the fiscal years in issue were attributable to the income generated by all of the goods and services sold by the cemetery and was not attributable directly to the sales of specific lots, crypts, or niches. In addition to using available funds generated from all the sales of the cemetery, Meadowlawn borrowed from commercial banks a large majority of the funds used for the year–end, lump–sum additional contributions. Board minutes indicate that Meadowlawn borrowed up to $50,000 in both fiscal years to accomplish these additional contributions.

The additional contributions to the trust fund appear at different locations on plaintiff's annual reports of financial operations than do the 10 percent contributions required by the Florida Cemetery Act. In fact, all the plaintiff's books and records treat the 10 percent trust fund contribution separate and apart from the additional contributions to the fund. The 10 percent statutory trust fund contributions by bookkeeping entry are related directly to a specific lot, crypt, or niche sale and are deducted as part of the costs of that specific sale. These 10 percent contributions are totalled each month and forwarded each month to the trustee for inclusion in the care and maintenance trust fund. In contrast, plaintiff's year–end, lump–sum contributions to its trust fund were treated on its annual report of financial operations as "extraordinary items," recorded as "excess contributions," and deducted after "net income from operations" was calculated.

In the early years of plaintiff's operations, the income generated by the trust fund would not have covered all of the cemetery maintenance expenses being incurred at the time. It is also clear that the income from the trust fund was inadequate to cover the care and maintenance expenses of the cemetery in either of the fiscal years in question. This was, or should have been, expected by Meadowlawn, because the care and maintenance trust fund provisions of the Florida Cemetery Act contemplated gradual growth of the trust corpus, and hence, of the income generated by the trust during the plaintiff's active business phase. (Fla.Stat. §§ 559.41 and 559.43.)

In the 10 counties surrounding and including plaintiff's cemetery, there are 42 cemeteries supervised by the Comptroller's Office of the State of Florida (*i. e.*, subject to the Florida Cemetery Act). Of these, only six cemeteries make contributions to their care and maintenance trust funds in excess of the requirements of the Florida Cemetery Act. Plaintiff made the largest additional contributions (measured as a percentage of sales, 36.8 percent in fiscal 1972 and 41.1 percent in fiscal 1973). Of the five others, the next highest cemetery contributed 25 percent of gross sales to its trust fund.

Meadowlawn made a business decision to try to build the trust fund up as fast as it possibly could. It intended the trust fund to be built up quickly so that the trust income would cover not only all the care and maintenance expenses when it entered its future passive business phase (*i. e.*, all cemetery lots, crypts and niches sold out), but also to cover as soon as possible all care and maintenance expenses needed during its active business phase (cemetery lots, crypts and niches still available to be sold).

For the years in issue, Meadowlawn paid the maintenance expenses of the cemetery out of operational funds—funds received from the current sales of cemetery property, goods and services. All such maintenance expenses were reported as business deductions by the corporation. As indicated above, the income from the trust fund was reinvested into the trust fund, even though it would have been available, pursuant to the Declaration of Trust, for use in defraying the care and maintenance expenses of the cemetery.

On February 27, 1975, plaintiff replaced its original trustee by means of an agreement entitled "Successor Declaration of Trust," executed with the Ellis First National Bank of New Port Richey. The successor perpetual care trust fund arrangement was adopted primarily to change the bank acting as the trustee for the care and maintenance trust fund. Meadowlawn wanted a bank closer to the location of their business and it was displeased with the former trustee's investment results. On May 21, 1976, the Successor Declaration of Trust was amended to provide that Meadowlawn would contribute 20 percent of gross sales receipts from the sales of lots, crypts and niches into the care and maintenance trust fund.

Following the fiscal years at issue, plaintiff also revised its contract of sale. The agreement was revised to make explicit reference to the care and maintenance trust fund and to inform the purchaser that Meadowlawn would perpetually provide care and maintenance of the cemetery. Meadowlawn is currently specifically obligated to contribute 20 percent of all sales receipts from lots, crypts and niches to the care and maintenance trust fund.

Also, following the fiscal years at issue, Meadowlawn borrowed money from its trust fund. By letter dated January 7, 1976, plaintiff requested the Comptroller's Office of the State of Florida to authorize plaintiff to withdraw the sum of $70,959.14 from the trust fund in order to pay the tax deficiency asserted by the Internal Revenue Service, which is the subject of this case. The authorization was granted.

Again, on October 5, 1977, plaintiff requested authorization to withdraw the sum of $70,000 from the trust fund in order to settle an antitrust suit brought against it by a private party. The authorization was again granted. In part, the authorization from the Comptroller's Office noted that

1334

the field office had already determined "that the cemetery [had] a substantial surplus in its trust account."

Rather than just withdrawing the sums, Meadowlawn borrowed the money from the trust fund. By agreement, the plaintiff was to pay 10 percent interest on the loans to the trust. Although the plaintiff could have borrowed the sums involved from a commercial source, it chose to borrow the funds from the trust in order to build the trust up rather than deplete it.

On its federal corporate income tax returns for each of the two taxable years in issue, plaintiff excluded or deducted from its gross income all contributions of every type to the trust fund. Thus, plaintiff excluded or deducted the statutory 10 percent contributions required by state law and the year-end, lump-sum contributions made pursuant to resolutions of the plaintiff's board of directors. The plaintiff also did not report the earnings of the trust fund that were reinvested in the trust.

The Internal Revenue Service disallowed plaintiff's tax treatment of the additional year-end, lump-sum payments and of the reinvested trust earnings, and accordingly assessed deficiencies for the two fiscal years involved.

After payment of the deficiencies, and rejection by the Internal Revenue Service of plaintiff's claim for a refund, plaintiff filed the present suit.

## DISCUSSION

How the plaintiff's additional contributions to the care and maintenance trust fund (i. e., the year-end, lump-sum additions plus the reinvested trust earnings) are to be treated for federal income tax purposes is the sole issue in this case. The Government does not contest the plaintiff's exclusion from gross income of its 10 percent statutory care and maintenance trust fund contribution. Plaintiff contends that the additional contributions (year-end, lump-sum additions and the reinvested trust earnings) should likewise be excluded from gross income, or in the alternative, at least be deductible as ordinary and neces-

sary business expenses, or somehow be allocable as a cost basis adjustment. Defendant counters that these additional contributions were properly treated by the IRS as gross income to the plaintiff and taxable as such.

### A. The Extent of Plaintiff's Contributions

At the outset, it appears to this court that during the taxable years in issue, plaintiff was required by the Florida Cemetery Act (Fla.Stat. §§ 559.30 et seq.) to deposit in its care and maintenance trust fund only the amounts prescribed by the Fla.Stat. § 559.43. The amount required was basically 10 percent of the payments received from the sales of cemetery lots, crypts and niches, and was to be deposited in trust on a monthly basis.

Plaintiff argues against the above conclusion, however, on the basis that the overriding State of Florida policy objective, as spelled out in the statute, was to ensure that all for-profit cemeteries in Florida provide adequate perpetual maintenance care. Plaintiff places great emphasis on the requirement of the Florida Cemetery Act that each cemetery is required to "maintain an adequate care and maintenance trust fund in accordance with the provisions of [the Act]." Fla.Stat. § 559.41. Plaintiff's point is that if the statute required that only 10 percent of sales be placed in trust, the legislature would not have needed to use the word "adequate"; and that, therefore, the legislature must have intended that cemetery companies place into trust whatever amounts are necessary, but not less than 10 percent of sales, to produce sufficient income to perpetually maintain the cemetery.

It may well have been the desire of the Florida state legislature that cemeteries set aside whatever amounts might be necessary to produce sufficient income to perpetually maintain the cemetery; however, it appears that the statute did not require that any more than 10 percent of sales be set aside for that purpose. It appears that the "provide or maintain an adequate care and

maintenance trust fund" language refers only to keeping the 10 percent of sales payments intact in the trust fund, rather than any obligation to make contributions in excess of the 10 percent of sales.

That the above is the correct interpretation of the Florida Cemetery Act's requirements is supported by the regulatory activities of the Comptroller's Office of the State of Florida, which supervised the cemetery trust funds. There was evidence that in the 10 counties surrounding and including plaintiff's cemetery, there were 42 cemeteries supervised by the Comptroller's Office, and of these, only six cemeteries make contributions to their care and maintenance trust funds in excess of the 10 percent requirement of the Florida Cemetery Act. Obviously, neither the Comptroller's Office nor the other 36 cemeteries have perceived a requirement or general need for cemeteries to make contributions in excess of the 10 percent of sales required by law.

Also, there are two letters in the record from the Comptroller's Office to the plaintiff that indicate quite clearly that the state views the plaintiff's additional contributions to the trust fund as a "surplus." That surplus could apparently be withdrawn, borrowed, or otherwise used to meet the future obligations of the plaintiff to contribute the 10 percent statutory contribution for those certain sales. Those letters, of course, were in response to the plaintiff's two requests for withdrawal of funds for use in paying the tax deficiency at issue in this case, and to pay for an antitrust law suit settlement unrelated to this case. In addition to providing support for the point that the statute only required that a 10 percent contribution from sales be made, it certainly casts doubt on the irrevocability of the additional contributions to the trust. In any event, based on the above, this court has concluded that plaintiff was *only required* by state law to contribute the statutory 10 percent of certain sales into its care and maintenance trust fund.

Similarly, an analysis of the written documents passing between plaintiff and its purchasers during the taxable years in issue makes it clear that the plaintiff's obligation to establish and maintain a care and maintenance trust fund was limited to the statutory 10 percent requirements of the Florida Cemetery Act. The sales agreement pursuant to which plaintiff sold interment rights and the Deed of Sepulchre were silent on the subject of perpetual care; however, the Deed of Sepulchre did make the conveyance subject to the rules and regulations of the cemetery. Those rules provided that a trust fund would be maintained for the perpetual care of the cemetery, but they also provided that plaintiff would "not be required to expend for maintenance or repair an amount greater than the net income from the perpetual care trust." The Certificate of Endowed Care provided only that the subject plot was "entitled to endowed care and maintenance * * * as required by the laws of the State of Florida and the rules and regulations of the Cemetery from time to time in force and effect," and that "a certain portion of the purchase price for the above described plot(s) shall be placed in trust in a permanent endowed care fund, such amount to be no less than prescribed by the laws of the State of Florida." Thus, plaintiff was not *contractually* obligated to contribute more than the statutory 10 percent amounts required by state law to its care and maintenance trust fund in the years in question.[1]

Nor did Meadowlawn's Trust Agreement obligate it to contribute more than the amounts required by the Florida Cemetery Act. The Declaration of Trust provided that Meadowlawn would place in trust the amounts required by the Florida Cemetery Act (*i. e.*, basically 10 percent of sales), and it also provided:

> The cemetery reserves the privileges of depositing greater amounts into such Trust Fund at the sole discretion of the Cemetery.

---

1. That plaintiff could have legally obligated itself to make greater contributions to its trust fund is apparent. Indeed, following the issue years, plaintiff revised its contract of sale and other documents. Meadowlawn is currently obligated to contribute at least 20 percent of all sales receipts into its trust fund.

Thus, although the Declaration of Trust allowed for additional contributions to be made to the trust fund, it in no way obligated the plaintiff to contribute any more than the amounts required to be contributed by the Florida Cemetery Act.[2]

Despite the fact that plaintiff was not bound by state law, by contractual obligation, or by its trust arrangement to contribute more than the statutory 10 percent amount required by state law to its trust fund, plaintiff in the years in question did make additional contributions to its trust fund in the form of reinvested trust fund earnings and certain year–end, lump–sum contributions at the behest of the board of directors of Meadowlawn. In the fiscal year ending February 29, 1972, a total of $81,547 (36.8 percent of gross sales of lots, crypts and niches) was contributed to the trust fund. Of this amount, $22,261 represented the 10 percent statutory contribution, $9,286 was contributed from earnings of the trust corpus that were either retained by the trust or recontributed to it by Meadowlawn, and $50,000 was contributed, which represented the year–end, lump–sum additional contribution made by the plaintiff pursuant to action of the board of directors of Meadowlawn. In the fiscal year ending February 28, 1973, a total $105,559 (41.1 percent of gross sales of lots, crypts and niches) was contributed to the trust fund. Of this amount, $25,815 represented the statutory contribution, $9,744 represented earnings reinvested, and $70,000 represented the additional year–end, lump–sum contribution made pursuant to action of the board of directors of Meadowlawn.

With respect to the reinvested earnings of the trust fund, the Declaration of Trust required that they be distributed annually to plaintiff for cemetery maintenance purposes. In the years in issue, plaintiff either left those earnings in the trust (construc-

tively received, however), or immediately recontributed those earnings that were received. For the purposes of analyzing the tax consequences of the additional contributions to the trust fund, the parties are agreed that the same principles apply to the reinvested earnings as to the year–end, lump–sum contributions. Accordingly, this court treats both forms of additional contributions the same for the purpose of evaluating their eligibility for exclusion, deduction, or cost adjustment tax treatment, and will concentrate on discussing the year–end, lump–sum additional contribution as the largest component part of the two additional contributions at issue.

### B. *Exclusion Issue*

 Plaintiff contends here that it is entitled to exclude from its gross income the amounts of all contributions that it made to its care and maintenance trust fund during the two taxable years in issue. Plaintiff, therefore, seeks to exclude from its gross income not only the 10 percent statutory amounts that state law required it to deposit in trust, but also the additional year–end, lump–sum contributions to the trust, and the trust earnings reinvested into the trust. This court cannot agree that those two additional contributions are entitled to be excluded from gross income.

It is well settled that when a cemetery sells lots and sets aside in trust a prescribed portion of the proceeds for perpetual care, the amounts so set aside in trust are excludable from gross income if they are held in an irrevocable trust as provided in a contract between the purchaser and the cemetery or as provided by state law. *See, e. g., Metairie Cemetery Association v. United States,* 282 F.2d 225 (5th Cir. 1960); *American Cemetery Co. v. United States,* 28 F.2d 918 (D.Kan.1928); *Troost Ave. Cemetery*

---

**2.** Even the Successor Declaration of Trust, adopted in 1975, did not obligate the plaintiff to contribute more than the statutory amounts, although it did provide, in part, that:

"The Cemetery reserves the right to pay into the Trust Fund any amount in excess of that required by the Laws of the State of Florida, until such time as the Trust Fund shall generate

enough income to actually care for and maintain the entire forty (40) acre cemetery without any assistance from any other source."

On May 21, 1976, the Successor Declaration of Trust was amended to provide that Meadowlawn would contribute 20 percent of gross sales to the trust fund.

*Co. v. United States*, 21 F.2d 194 (W.D.Mo. 1927); *Ferncliff Cemetery Mausoleum Co. v. Commissioner*, 35 B.T.A. 1037 (1937); *Community Mausoleum Co. v. Commissioner*, 33 B.T.A. 19 (1935). In Rev.Rul. 58–190, 1958–1 C.B. 15 (1958), the Internal Revenue Service adopted a similar position. In pertinent part, that revenue ruling states:

A cemetery company or corporation, operated for profit, shall not be required to include in gross income, for Federal income tax purposes, that portion of the contract sale price of burial lots, or mausoleum crypts, which, by requirement of state law or its own by–laws and/or contracts, it is obligated to irrevocably set aside in trust solely for perpetual care and maintenance of the cemetery, burial lots, or mausoleum crypts to the extent that such portion is so set aside.

\* \* \* \* \* \*

SITUATION 1.

A cemetery association, company, corporation, or society organized and operated for profit under the laws of the state in which it is located, sells certain rights in burial lots, or mausoleum crypts, and maintains and cares for the cemetery grounds and buildings. Under the state law, and/or in accordance with the by–laws and contracts of the organization, it sets aside a stated percentage of the gross proceeds from the sale of the burial lots and crypts in an irrevocable trust, as a trust fund, the income from which is to be applied to the perpetual care and maintenance of the cemetery, burial lots, and mausoleum crypts.

It is held that the portion of the receipts from the sale of burial lots and mausoleum crypts set aside by a profit cemetery company, pursuant to state law and/or pursuant to its by–laws and contracts, as a fund to be used for the perpetual care of the burial lots, and mausoleum crypts constitutes a trust fund from the very instant such portion passes into the hands of the company and that such fund so set apart does not give rise to taxable income to the company.

The above revenue ruling addresses the exclusion issue before this court. According to Mertens:

The vital question in these cemetery cases is whether payments are impressed with a trust. \* \* \* A trust must be created and the taxpayer must be bound, either by statute or its agreement, to pay certain sums into the trust fund and it must be impossible for the principle or income of the trust fund to inure to the benefit of the taxpayer. Whether the income is impressed with a trust is essentially a question of fact. [2 Mertens, The Law of Federal Income Taxation § 12.71 (1974) (footnotes omitted).]

In the present case the rule that seems to be dispositive of the exclusion issue is that in order to qualify for the exclusion, the taxpayer must make:

[A] showing that the funds were received by the taxpayer more or less as a conduit and placed in an established trust, or definitely impressed with a trust by contract or by law when received and actually set aside in separate asset funds or amounts and held in trust by the taxpayer for the specified purpose, as in *Community Mausoleum Co.*, 33 B.T.A. 19; *Ferncliff Cemetery Mausoleum Co.*, 35 B.T.A. 1037; *Mountain View Cemetery Association*, 35 B.T.A. 893, *Portland Cremation Ass'n v. Commissioner*, 31 F.2d 843, reversing 10 B.T.A. 65; and *Evergreen Cemetery Association of Chicago*, 21 B.T.A. 1194. [*Hawaiian Cemetery Association, Ltd. v. Commissioner*, 34 T.C. 1093, 1100 (1960).]

This court has already found that in the years in question, plaintiff was not obligated by state law, by contract, or by its trust arrangement to contribute more than 10 percent of the proceeds from sales to its care and maintenance trust fund. In the absence of such a binding obligation to make such additional contributions to its trust fund, plaintiff cannot make the requisite showing that the funds out of which those additional contributions were made were received by the taxpayer more or less as a conduit or were definitely impressed

with a trust when received. Accordingly, the additional contributions to the trust fund cannot qualify for an exclusion from gross income.

Several other points can be quickly made to support this conclusion. First, the plaintiff's books and other financial documents treated plaintiff's year–end, lump–sum contributions to the trust fund as "extraordinary items," recorded as "excess contributions," and deductible after "net income from operations," was calculated for plaintiff's annual reports for the years in question. In short, the books and record of the plaintiff reflect that the additional contributions were not directly related to specific sales of lots, crypts and niches, but were attributable to profits of the entire cemetery operation and to borrowings from commercial banks. Needless to say, the reinvested trust earnings bore no relationship to the sales of lots, crypts and niches either. Second, the plaintiff's president testified that the additional year–end payments "do not become trust funds until the contribution is made by the corporation," and the amount of such contribution "would certainly be in the discretion of the board [of directors of Meadowlawn]." It appears that the reinvestment of trust earnings was equally in the discretion and control of the board of directors of Meadowlawn. Such discretion, asserted by the plaintiff at the end of each fiscal year, is incompatible with the concept of a trust, where the theory is that a portion of the sales receipts received on each sale flow as a conduit from the hands of the cemetery immediately into the hands of a trustee. Third, the fact that the plaintiff could withdraw from the trust fund what the state considered the trust's surplus (i. e., contributions beyond the 10 percent statutory contribution required) is another indication that the trust was hardly an irrevocable one as to the additional contributions. It is hard not to consider the trust as merely a convenient reserve that could be dipped into at the discretion and pleasure of the board of directors. Finally, it is clear that Meadowlawn had a business policy of trying to build up the trust fund as fast as it possibly could, and the year–end, lump–sum additional contributions and reinvestment of earnings were the methods used to accomplish that business goal. These additional contributions were attributable to profits for all of the cemetery (and commercial borrowings) and do not relate by means of a fixed percentage to the proceeds from sales of specific cemetery lots, crypts, or niches. Under the circumstances, it is difficult to understand how plaintiff can claim that such additional contributions could be impressed with a trust when received and thereby be entitled to be excluded from gross income.

Plaintiff relies heavily on *Portland Cremation Ass'n v. Commissioner*, 31 F.2d 843 (9th Cir. 1929). In that case, representations were made to customers that a portion of the purchase price would be placed in a permanent maintenance fund, but no set amount or percentage was mentioned. However, the board of directors by resolution did bind the cemetery to pay 20 percent of the gross lot sales into a maintenance fund. Pursuant to that resolution of its board of directors, the crematorium operator deducted 20 percent of gross sales for a maintenance fund in order to pay the expenses of maintenance. The court, there, thought that the crucial question was:

> Did the petitioner's patrons possess the right to protect themselves and demand the preservation of the fund which the petitioner had covenanted with them to maintain and by its resolution had set apart for maintenance? [*Portland, supra,* 31 F.2d at 846.]

Since the court believed that the patrons had such rights, it reversed the Board of Tax Appeals and ruled that the maintenance fund was essentially a trust fund and, hence, not income to the taxpayer (i. e., exclusion from income was allowed).

It appears to be plaintiff's position in the present case that, even though Meadowlawn's board of directors failed to specify in its corporate resolutions that a fixed percentage of the sales would be placed into trust as was the case in *Portland, supra,* nevertheless, Meadowlawn, through its general representations to its customers, and

its Declaration of Trust, Deed of Sepulchre, Rules and Regulations, and Certificate of Endowed Care, covenanted that it would place into trust *whatever amounts* would be necessary in order to provide sufficient income to perpetually maintain the cemetery. Therefore, plaintiff argues that it ought to be entitled to exclude from its gross income such amounts as it has actually so contributed to the trust.

At the outset, this court is unsure that the *Portland* case would be decided the same way today.[3] But even if the case is still good law, this court does not believe that Meadowlawn can meet the *Portland* test. In the present case, Meadowlawn's additional contributions to its trust were in no way related to current sales, whereas, in *Portland supra*, the board of directors specified that 20 percent of sales would be placed in the maintenance fund. The court in *Portland, supra*, believed that diversion of funds from the perpetual care purpose might well be enjoined by a suit in equity as a violation of the trust agreement. This court cannot reach the same conclusion under the facts present in this case.

Instead, the failure of the resolutions of the board of directors of Meadowlawn to specifically relate the additional contributions made to the trust in the years at issue to the sales of cemetery property would prejudice purchasers in any suit to enjoin withdrawal or diversion of those funds relating to the additional contributions. Plaintiff's agreements have specifically limited its trust obligation to the requirements of Florida law. It is true, of course, that Fla.Stat. § 559.41 would prevent any withdrawal or transfer of the corpus of the care and maintenance trust fund without written consent from the state regulatory authorities. Subsequent events have made it clear, however, that the Comptroller's Office of the State of Florida believed that

the Meadowlawn trust had a "substantial surplus" over and above the 10 percent statutory contribution required by law and so granted approval for substantial withdrawals from the trust on two occasions. Under the circumstances, this court cannot agree that *Portland, supra*, is compelling precedent to support plaintiff's position.

Plaintiff also seeks to rely on *Evergreen Cemetery Association v. Commissioner*, 21 B.T.A. 1194 (1931). In that case:

The board of directors decided at the end of each year how much from the sale of lots would be set aside for the said care or maintenance fund for the *following year*, basing its action on the cost of maintenance and the number of square feet sold. [*Evergreen, supra*, 21 B.T.A. at 1195 (emphasis added).]

The board noted that the "purchasers of lots in the cemetery had such an interest as might be protected and enforced in a court of equity." *Evergreen, supra*, 21 B.T.A. at 1196. The board went on to conclude that:

The representations made by the petitioner in its advertising matter, contracts and deeds as to the "perpetual care fund," taken in connection with the positive and uncontradicted testimony of the treasurer of the fund touching the same, in our opinion, establish the existence and character of such a trust fund, and the amount thereof set aside as a reserve in 1923, $17,185.50, and now in controversy, constitutes no part of petitioner's gross income for said year and is not taxable income to it. [*Evergreen, supra*, 21 B.T.A. at 1197.]

In the present case, plaintiff's board of directors decided at the end of each issue year how much should be contributed to its trust fund in *that* year, over and above the 10 percent statutory contribution required to be contributed by state law. Also, it is at best unclear as to whether or not the

---

**3.** Note that Mertens called *Portland Cremation Ass'n v. Comm'r*, 31 F.2d 843 (9th Cir. 1929) a "liberal decision." 2 Mertens, The Law of Federal Income Taxation § 12.71. Subsequent cases have noted that the Government has rights in such matters independent of the lot purchasers; therefore, the existence of an en-

forceable trust relationship may not be a sufficient condition to justify the requested tax treatment. *See especially Acacia Park Cemetery Ass'n v. Comm'r*, 67 F.2d 700 (7th Cir. 1933); *Cedar Park Cemetery Ass'n v. Comm'r*, 67 F.2d 699 (7th Cir. 1933), *cert. denied*, 292 U.S. 639 (1934).

purchasers of lots at Meadowlawn would have such an interest as might be protected in a court of equity. Therefore, it appears to this court that plaintiff's reliance on *Evergreen, supra,* is also misplaced.

Finally, and more importantly, the particular issue involved in the present case has been addressed before. In *Fairmount Cemetery Association v. United States,* 51 AFTR 1445, 56–2 U.S. Tax Cas. (CCH) 56,-239 (D.Colo.1956), the taxpayer was required by contract to and did place certain amounts into a trust fund for care and maintenance. The taxpayer also made additional payments of $10,000 per year to increase the corpus of the trust in order to meet the rising costs of maintenance and sought to exclude these additional contributions from its gross income. The district court there concluded:

2. The amounts paid into the irrevocable trust fund by the plaintiff to provide income for the perpetual care and maintenance of cemetery lots sold, which amounts were in no way related to current sales, or to sales in any other year, were not funds impressed in any way with a trust, and for that reason are not properly excludable from gross income for income tax purposes in the year in which paid. [*Fairmount, supra,* 51 AFTR at 1447, 56–2 U.S. Tax Cas. (CCH) at 56,241.]

In the present case, this court has concluded that the plaintiff was in no way contractually or otherwise legally obligated to contribute more than the amounts required by Florida state law. Moreover, the additional contributions were in no way related to specific sales made during the current year. Finally, the actual extent of the additional contributions was in the discretion of the board of directors of Meadowlawn and was not finally decided until the end of each tax year in question. Accordingly, this court concludes that the additional contributions to plaintiff's perpetual care trust fund were not impressed with a trust when received and for that reason are not properly excludable from gross income in the year paid. *See Fairmount, supra, cf.*

*New York and New Jersey Mausoleum Co. v. Commissioner,* 26 B.T.A. 128 (1932); 2 Mertens, The Law of Federal Income Taxation § 12.71.

## C. Deduction Issue

Plaintiff alternately contends that it is entitled to deduct those additional contributions as ordinary and necessary business expenses within the meaning of section 162(a) of the Internal Revenue Code of 1954.

Section 162(a), provides, in part, as follows:

SEC. 162. *TRADE OR BUSINESS EXPENSES.*

(a) *In General.*–There shall be allowed. as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year * * *.

Because plaintiff has failed to bring itself within the above quoted statutory language, it does not prevail on this alternative argument either.

### 1. Additional Contributions Not Allocable to Current Sales.

Whether or not plaintiff is entitled to a deduction is governed by many of the same principles which governed the exclusion issue. Some cases, however, have granted deductions where the theory behind the granting of an exclusion would not have been applicable. As the following discussion makes clear, such is not the case here.

In *Acacia Park Cemetery Ass'n v. Commissioner,* 67 F.2d 700 (7th Cir. 1933), a cemetery failed to actually set aside the 10 percent of sales of burial lots that it was required by its trust agreement and sales contracts to set aside. Although the cemetery association intended to make up the deficit later, the court held that the cemetery was not entitled to a deduction until the money was actually set aside in trust. *See also Green Lawn Memorial Park, Inc. v. McDonald,* 164 F.Supp. 438 (M.D.Pa.1958), *aff'd,* 262 F.2d 588 (3rd Cir. 1959) (per curiam); *Hawaiian Cemetery Association v. Commissioner,* 34 T.C. 1093 (1960).

In another case, a cemetery had failed to comply with its duty to create and maintain a trust in certain years and so was denied the exclusion. in those years. When the cemetery cured the "deficit" by subsequently setting aside the required amounts, the court allowed it to take the deduction in the later years when the required amounts were actually paid. *Memphis Memorial Park v. McCann*, 133 F.Supp. 293 (M.D. Tenn.1955).

In the present case, the opposite situation exists: Meadowlawn is seeking to deduct contributions to its trust fund over and above the amounts it was actually legally obligated to contribute in the tax years in question. The question boils down to whether or not a cemetery may deduct from its gross income amounts contributed to a trust beyond what it was statutorily or contractually obligated to contribute. In order for this court to have allowed such a deduction, Meadowlawn must have demonstrated some relationship between the proposed deduction and the actual expenses for that taxable year. It failed to do this.

Virtually the identical question was confronted by the Board of Tax Appeals in *Woodlawn Cemetery Association v. Commissioner*, 28 B.T.A. 882 (1933). In that case a Michigan cemetery association sought to deduct either as an ordinary and necessary business expense or as a loss in the years 1928 and 1929, the amounts paid over to an irrevocable trust for perpetual care. The board made the following determinations:

> Prior to 1928, the petitioner's sale contract contained no specific provision for a fund for perpetual care. All sales of lots were made subject to the petitioner's rules and regulations, which guaranteed the present and future general care of all lots and stated that a portion (no specific portion) of the sale price would be set aside for that purpose. In 1928, after the trust fund had been created, a new sale contract was adopted which provided that approximately 25 cents per square foot of the purchase price of each lot sold would be paid into a perpetual care fund. As to the sales made under the new contract, the specified amount of 25 cents per square foot on the lots sold was impressed with a trust upon its receipt and was therefore not income to the petitioner. [Citations omitted.]

> However, as to the prior sales made under the old contract the petitioner was not obligated, either contractually or by law, to set aside any specific portion of the sales price for perpetual care and no part of such income was impressed with the trust. Cf. *Portland Cremation Assn. v. Commissioner, supra.*

\* \* \* \* \* \*

We are of the opinion that the amounts transferred to the perpetual care fund in 1928 and 1929 in excess of 25 cents per square foot on the lots sold during those years are not deductible either as ordinary and necessary business expenses of those years or as losses. The petitioner is entitled to deduct in each year as a business expense the amount actually paid out by it during such year for the care of the lots, but to the extent that the amounts paid into the trust fund in 1928 and 1929 represented a capital reserve or trust fund for future care of the lots they were in no sense an expense of the taxable years before us. There is no authorization at law for the deduction of the amounts set aside out of its earnings of prior years, or out of its current earnings, in excess of its contractual obligation, for the care of lots in future years. Income must be computed upon an annual basis and the tax liability of each year must be determined with reference to the receipts and expenditures of that year. *Burnet v. Sanford & Brooks Co.*, 282 U.S. 359, 51 S.Ct. 150, 75 L.Ed. 383.

There was no element of a loss in the transaction by which the amounts in dispute were transferred to the trust fund. The entire net income from the fund was to be used in the care of the lots. This was an annual expense which the petitioner was obligated to meet in some manner. If there had been no trust fund established for that purpose, then the pe-

titioner would have been required to pay the cost each year out of its own funds. [*Woodlawn, supra,* 28 B.T.A. at 885–86.] Accordingly, the board denied the deduction sought for those contributions to the trust fund in excess of the amounts required to be deposited by the contract that the taxpayer was using at that time. The case of *Fairmount Cemetery Association v. United States,* 51 AFTR 1445, 56–2 U.S. Tax Cas. 56,237 (D.Colo.1956), discussed *supra,* is really to the same effect although focusing on the question of exclusion rather than deduction.

It is clear that plaintiff in no way legally obligated itself to contribute to its trust any more than the statutory amounts required by state law in either of the fiscal year time frames at issue. Indeed, the written documents passing between plaintiff and its purchasers and its Declaration of Trust avoid any specific obligation for the plaintiff to contribute more than the statutory amounts required by state law. Had plaintiff's year–end resolutions specifically related the additional contributions to the fiscal year sales, this court might have been more favorably disposed to the view that such additional contributions were, in fact, expenses for that fiscal year and therefore deductible. *Cf. Portland Cremation Ass'n v. Commissioner,* 31 F.2d 843 (9th Cir. 1929).

As it is, however, there being no obligation to make the additional contributions, the plaintiff is asking this court to hold that voluntary contributions to a capital reserve for future expenses constitutes a business expense. The existing law requires otherwise.

2. *Additional Contributions Treated as a Reserve.*

 Since plaintiff was only obligated by statute to contribute 10 percent of sales and since the Comptroller's Office of the State of Florida regarded any additional contributions as a surplus that could be used to satisfy future obligations to contribute, it is apparent that the additional contributions are properly viewed as a reserve for future expenses. No deduction may be allowed for a contribution to such a reserve. *Brown v. Helvering,* 291 U.S. 193, 54 S.Ct. 356, 78 L.Ed. 725 (1934); *American Automobile Association v. United States,* 367 U.S. 687, 81 S.Ct. 1727, 6 L.Ed.2d 1109 (1961). *See also* Treas.Reg. § 1.461–1(a)(2).

Transactions by Meadowlawn with the Comptroller's Office reveal that office regarded any contribution in excess of the 10 percent as surplus. Such surplus can be used to satisfy future obligations to contribute the 10 percent statutory amount or, with the permission of the office, it could be borrowed or withdrawn for apparently any good business reason (*e. g.,* anti–trust suit settlements). For purposes of this decision, it is only necessary to accept as fact that the surplus could not be used to satisfy future obligations that are not necessarily related to future cemetery maintenance expenses. Plaintiff has not shown that the Comptroller's Office or anyone else could have or would have prevented such use of the surplus. In addition, it is also apparent that no one could or would force (there is no enforceable obligation) Meadowlawn to contribute 10 percent in any year when the fund contains a surplus. Thus, this court concludes that the excess contributions represent a reserve for future expenses, which are not deductible.

The 1954 IRS Code originally contained a provision allowing for such reserves. However, apparently practical considerations and broader policy reasons soon dictated a retroactive withdrawal of that provision. I.R.C. § 462 (1954) repealed, 69 Stat. 134 (1955). *See American Automobile Association v. United States,* 367 U.S. 687, 694–98, 81 S.Ct. 1727, 1730–31, 6 L.Ed.2d 1109 (1961). Favorable tax consequences can thus only be obtained when a specific code section provides such treatment. *E.g.,* I.R.C. §§ 455, 166(f), 801. *Colonial Surety Co. v. United States,* 147 Ct.Cl. 643, 178 F.Supp. 600 (1959) (deduction for reserve denied). Plaintiff is unable to point to a specific provision which exempts its contributions from the general rule regarding such reserves. Therefore, this court holds as the Board of Tax Appeals held in *Wood-*

*lawn Cemetery Association v. Commissioner*, 28 B.T.A. 882, 886 (1933): The additional contributions,

> represented a capital reserve or trust fund for future care [which was] in no sense an expense of the taxable years * * *. There is no authorization at law for the deduction of amounts * * * in excess of its contractual obligation, for the care of lots in future years.

As the Supreme Court stated in *Deputy v. duPont*, 308 U.S. 488, 493, 60 S.Ct. 363, 366, 84 L.Ed. 416 (1940), deductions depend upon "legislative grace; and only as there is clear provision therefor can any particular deduction be allowed."

Thus, the plaintiff's additional contributions to the care and maintenance trust fund were voluntary contributions to a reserve fund for future expenses, which cannot appropriately be deducted.

### 3. *Additional Contributions–Failure of Proof.*

■ Another reason for rejecting plaintiff's deduction argument is that it has failed to establish that its additional contributions were business expenses that were ordinary and necessary to deduct for the years at issue in order to provide for the future perpetual care of the cemetery. While plaintiff was obligated by state law to contribute 10 percent of sales, plaintiff's year–end, lump–sum additional payments and reinvestments of trust earnings interest were voluntary. There is no evidence that, in making these additional contributions, plaintiff made any calculation of anticipated future perpetual care expenses or any calculation of the funding *necessary* to meet those anticipated future expenses. In fact, what evidence there is on the point would tend to raise the inference that the statutory 10 percent contribution was closer to the mark, than the plaintiff's actual contributions. Of 42 cemeteries offering perpetual care in the immediate 10–county area to plaintiff, only six made contributions to their trusts in excess of the statutory 10 percent.

Meadowlawn here seeks to define the perpetual care expenses by reference to current care and maintenance expenses of the ongoing cemetery, *i. e.,* during Meadowlawn's active business phase, when it is very capable of generating enough income to meet whatever care and maintenance expenses are necessary. Those current maintenance expenses include the costs of opening and closing graves and presumably includes other expenses incurred in the initial development and improvement of the land for interment. Such initial planning and work are not representative of the cost of maintaining the cemetery after it enters its future passive business phase or perpetual care phase.

The record is devoid of any substantial evidence of what those perpetual care costs would be. The testimony of the president of Meadowlawn who attempted to establish that the current maintenance expense was a reasonable estimate of the perpetual care costs must be discounted.

Even more to the point, plaintiff, by its argument, assumes that the trust fund income should be able to pay the maintenance costs currently. The trust is not supposed to be able to fund the care and maintenance of the cemetery from the moment of its inception. A care and maintenance trust fund is meant to defray perpetual care costs of a no longer active business cemetery (a cemetery that has sold all interment rights and thus completely built up its perpetual care fund).

As indicated, plaintiff presented no credible evidence on this point. At no time did plaintiff even attempt to establish the amount that the care and maintenance trust fund would contain when all interment rights had been sold, or of the ability of the fund, at that time, to generate sufficient trust income to maintain the cemetery. Such proof, which would establish that plaintiff expected the 10 percent contributions to be insufficient, was important to plaintiff's case.

In a similar case where the cemetery had obligated itself to contribute $100,000, the court implicitly recognized the *necessity* for

a "proportionate pay in" by allowing an exclusion for 8.97 percent of sales. *Ferncliff Cemetery Mausoleum Co. v. Commissioner*, 35 B.T.A. 1037 (1937). The reasoning for the proportionate exclusion applies equally to a deduction and requires a "proportionate pay in" to help prevent tax avoidance/deferment.

Without the proof described above, this court would be unwarranted in allowing a deduction.

### D. *Cost Adjustment Issue*

Alternatively, the plaintiff contends that the additional contributions to its care and maintenance trust fund during each year in issue ought to form a part of the basis or costs of the lots sold during such year. Meadowlawn premises this argument on the case of *Acacia Park Cemetery Ass'n v. Commissioner*, 67 F.2d 700 (7th Cir. 1933). For the reasons set forth below, plaintiff is not entitled to recover under this theory either.

The additional contributions made to the plaintiff's care and maintenance trust fund were not directly related to any particular sales of cemetery lots, crypts, or niches made during the issue years, and did not change or affect these particular assets in any way. Moreover, the additional contributions were made at the end of the tax years in question, and so were essentially made after the taxpayer had realized its gain on the sales of the lots for the year. Under such circumstances, it is difficult to understand how the plaintiff can urge that the additional contributions be apportioned over the lot sales preceding the actual contributions. Plaintiff has made this argument in the broadest terms, as a final contention for reducing its tax liability. Plaintiff has failed to present any rational basis for allocating the additional contributions as costs of the particular assets (lots, crypts, and niches).

The question of apportionment of the additional contributions over the lots need not be reached, however, since contributions to a care and maintenance trust fund are not the kind of expenditures that would qualify for basis adjustment. The *Acacia Park*

*Cemetery Ass'n* case, *supra*, upon which plaintiff relies, involved a cemetery that had obligated itself by contract to place in trust 10 percent of the proceeds from the sale of burial lots (up to $100,000 for each subdivision garden of the cemetery) for perpetual care. The funds were not actually set aside, but the cemetery intended to make up the deficit later. It sought to deduct the moneys intended to be contributed to the trust, or to add $100,000 to the cost basis of each of the cemetery divisions for the purpose of computing gain on the sale of lots therein. The Board of Tax Appeals denied the claim as follows:

> We are of the opinion that there is no merit in petitioner's contention that the cost of the lots sold was inclusive of an amount to be paid in by lot purchasers to provide for perpetual care. The cost of land and improvements was not enhanced by the fact that the petitioner was to provide perpetual care. While we have held, under certain circumstances, that the cost of improvements and additions legally bound to be made by contract when lots in a real estate development are sold may be added to the cost of lots (*Milton A. Mackay*, 11 B.T.A. 569; *Birdneck Realty Corp.*, 25 B.T.A. 1084), it does not follow that future ordinary expenses and upkeep may be so treated. Expenses are deductible when paid or incurred. Even when it is known that expenses will be incurred in a subsequent year, it is not a ground for allowing a deduction in a previous year. The petitioner's contention on this point is not sustained. [*Acacia Park Cemetery Association v. Commissioner*, 27 B.T.A. 233, 237 (1932).]

The Court of Appeals for the Seventh Circuit affirmed, noting,

> [T]hat cost, used as a basis for determining gain from the sale of land is ordinarily made up of two items: (1) the amount paid for the land, plus (2) the outlay for any improvements thereon. [*Acacia Park Cemetery Ass'n v. Commissioner*, 67 F.2d 700, 703 (7th Cir. 1933).]

The court, there, was convinced "that capitalization of the probable expense of main-

taining the graves [could] not be said to constitute a part of the cost of the land." *Acacia Park, supra,* 67 F.2d at 703.

■ Plaintiff here is not entitled to capitalize the additional contributions or otherwise apportion them over the cost of lots, crypts, or niches sold in the issue year or thereafter. *Acacia Park Cemetery Ass'n v. Commissioner, supra. See also Cedar Park Cemetery Ass'n v. Commissioner,* 67 F.2d 699 (7th Cir. 1933), *cert. denied,* 292 U.S. 639, 54 S.Ct. 773, 78 L.Ed. 1491 (1934); *cf. Parkland Improvement Co.,* 1941 B.T.A. Mem. Dec. (P–H) 1387. The *Cedar Park* case found that the Commissioner had erroneously allowed basis adjustments in previous years. The court found that the proper treatment for contributions to a perpetual care trust was an exclusion from income. In *Parkland,* the court implicitly found that maintenance contributions were not capital expenditures.

### Summary

In summary, this court concludes that the plaintiff is not entitled to recover for additional contributions to its care and maintenance trust fund in its two fiscal years (1972 and 1973) at issue, the amounts of which were over and above the statutory amounts required to be placed in trust by state law. Those additional contributions are not excludable from gross income, deductible as ordinary and necessary business expenses, or otherwise allocable as a cost basis adjustment.

### CONCLUSION OF LAW

Upon the findings of fact and the foregoing opinion, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover under either Count I or Count II of its petition, which petition is therefore dismissed.