YANKEE ATOMIC ELECTRIC
CO., Appellee,

v.

The UNITED STATES, Appellant.

Appeal No. 85–2275.

United States Court of Appeals,
Federal Circuit.

Jan. 29, 1986.

Francis M. Allegra, Tax Div., Dept. of Justice, Washington, D.C., argued for appellant. With him on the brief were Glenn L. Archer, Jr., Asst. Atty. Gen., Michael L. Paup and Richard Farber.

John S. Nolan, Miller & Chevalier, Chartered, Washington, D.C., argued for appellee. With him on the brief were Harry K. Mansfield, Ropes & Gray, Boston, Mass., and F. Brook Voght and Keith D. Lawson, of Miller & Chevalier, Chartered.

Before BALDWIN, Circuit Judge, NICHOLS, Senior Circuit Judge, and KASHIWA, Circuit Judge.*

NICHOLS, Senior Circuit Judge.

This is an appeal from the Claims Court in a suit for income tax refund. In an unpublished bench opinion, former Chief Judge Kozinski granted a motion by plaintiff-appellee for summary judgment. By stipulation, the judgment was set at $1,311,843.65, plus interest and costs. We affirm.

*Facts*

Appellee corporation (taxpayer) owns and operates as substantially its sole asset and business an atomic generating facility at Rowe, Massachusetts. Its stockholders and customers are various New England utilities who supply power to consumers. The claim is for refund of income tax paid by taxpayer for its year ending December 31, 1981, on sums reported by it, erroneously it says, as its income, but actually paid

---

* Judge Kashiwa heard the oral argument in this case, participated in the panel discussion and vote that followed, and indicated his choice to join in this opinion after it was written. His retirement, effective January 7, 1986, occurred before it was ready for promulgation under the internal procedures of the court.

by its stockholder-customers to an independent trust of which State Street Trust Company of Boston is trustee. Bills had been rendered in two parts, calling for payment by each direct customer of two separate sums, one to taxpayer for the power furnished at a regulated rate, and another to the trust, also as prescribed. The trust was wholly independent of taxpayer and its payments were made direct to it. Through such payments a fund, corpus of the trust, was to be accumulated, with interest, up to $30,000,000, to be used to recompense taxpayer for the anticipated high cost of decommissioning the facility. Until the time of decommissioning taxpayer had, under the trust agreement, no access to the fund and no control over it. The decommissioning will be necessary for safety as the plant would be dangerously radioactive, and will occur possibly much earlier than the expiration of taxpayer's license in 1997. Any surplus of the fund over the decommissioning cost is to be fed back to the ratepayer. Such a surplus is possible as estimates of decommissioning costs ran under $30,000,000 and the figure apparently includes allowances for future inflation.

Before 1980, the taxpayer had billed customers at rates including their contribution to a reserve for decommissioning on the taxpayer's books. This was not satisfactory to the staff of the Federal Energy Regulatory Commission (FERC). They feared the arrangements to fund the decommissioning would fail. As the plant would have to be decommissioned, the "taxpayer" (presumably all the federal ones) then would have to pay a cost which should be assessed on the ratepayers pro rata over the life of the facility. The taxpayer submitted the plan summarized above in connection with a rate proceeding and it obtained approval all around, including intervening state regulatory agencies. The matter was particularly important in a case, such as this, where the utility had no other plant, and so would be out of business when Rowe stopped producing power.

The parties have debated here at length whether the trust arrangement was "imposed" by the FERC or whether it was a scheme devised by private interests for their own purposes and merely accepted by the regulators. Should this issue be crucial, it could be that summary judgment was improvidently granted as there was an issue of fact for trial. However, we think we can accept, arguendo, the government's version of the facts, and still affirm.

There is no suggestion that the trust fund was a sham or that it was not needed for decommissioning. The government simply says payments to the trust are still taxpayer's income and must be taxed as such. If it is right, the special assessments on the ratepayers would have to be enlarged enough to cover the taxes on the payments, or else the fund would never be sufficient. However, the issue ceases to be important in taxable 1984, when I.R.C. § 468A, Pub.L. No. 98–369, Title I, § 91(c)(1), July 18, 1984, 98 Stat. 604, provides a statutory way to reach the desired end.

The question debated before Chief Judge Kozinski, and sole reliance of the IRS, was whether the *Lucas v. Earl*, 281 U.S. 111, 50 S.Ct. 241, 74 L.Ed. 731 (1930) assignment of income doctrine applies by which income is taxed to him who earns it, not to her to whom he arranges to have it paid. The alternative was said to be provided in *Commissioner v. First Security Bank*, 405 U.S. 394, 92 S.Ct. 1085, 31 L.Ed.2d 318 (1972), holding that income cannot be imputed under the assignment of income doctrine to one who, by operation of law, cannot receive it. The Chief Judge thought the FERC imposed the trust arrangement, making the latter doctrine controlling. He did not believe anything taxpayer did was or could be done free of the heavy regulatory hand.

### Discussion

The issue whether the FERC "imposed" the trust arrangement turns on a conclusion of fact, and while the underlying facts are undisputed, whether the factual conclusion Judge Kozinski drew should be drawn would most likely require a fact finding

inappropriate to summary judgment. The government denies that FERC imposed the trust arrangement. We think the judgment is equally sustainable if the trust arrangement is supposed to have been created by willing agreement between the parties and the FERC, as opposed to a FERC imposed agreement, so long as it is valid and enforceable at law, and so much the government does not deny.

The assignment of income doctrine is a familiar principle of income taxation: "that income is taxed to the party who earns it and that liability may not be avoided through an anticipatory assignment of that income * * *." *United States v. Basye*, 410 U.S. 441, 447, 93 S.Ct. 1080, 1084–85, 35 L.Ed.2d 412 (1973). This trust fund appears to us a typical escrow arrangement often resorted to in order to defer payments to a contractor who has not yet earned them and may never do so. We note that taxpayer here will not earn them unless and until it decommissions the facility. Even then it may not earn all of them as the highly uncertain cost of decommissioning may not be as much as is accumulated in the fund. In that event, the excess is refunded to the "ratepayers," showing who the true owners of the fund are. Though unlikely, it is possible the facility will never be decommissioned. It may have to be decommissioned by someone else because of taxpayer's insolvency, though the availability of the fund makes this less likely. In either of these events, the taxpayer would never earn any part of the fund. It has a present benefit in that its mind is eased as to how the decommissioning for which it is responsible is to be funded, but this is as true of future payments as it is of those made in the taxable year. It is true taxpayer will benefit more if it does decommission and does obtain reimbursement by the fund, but so will the ratepayers and the other "taxpayers" who are the objects of the FERC staff's concerns.

The previous arrangement aroused concern precisely because taxpayer obtained control of the funds assessed on the ratepayers before earning them. It did not segregate these funds, except by a paper accounting reserve. In the event of financial difficulties, general creditors of the taxpayer might obtain parts of the funds or they might otherwise be depleted, leaving the federal taxpayer to pick up the tab for decommissioning. The payments up to 1980, earmarked for decommissioning but paid into the taxpayer's general fund, were not earned as received, but rather were advance payments for future services.

We have not been shown by either side any case in which payments into an escrow to fund future services are treated as current income of the contractor under the "assignment of income" doctrine. One case which is binding precedent in this court is squarely the other way. This is *Meadowlawn Memorial Gardens, Inc. v. United States*, 634 F.2d 1329 (Ct.Cl.1980). The court said at 1336—

> It is well settled that when a cemetery sells lots and sets aside in trust a prescribed portion of the proceeds for perpetual care, the amounts so set aside in trust are excludable from gross income if they are held in an irrevocable trust as provided in a contract between the purchaser and the cemetery or as provided by state law [citing several cases and a Revenue Ruling].

The government relies almost wholly on *United States v. Basye, supra,* but that case is not in point. Taxpayers there were doctors, joined in a partnership named Permanante Medical Group, which by contract provided medical services for subscribers to the Kaiser Foundation Health Plan. Part of the agreed compensation consisted of payments to a bank as trustee to create a retirement plan for participating doctors. The partnership had no control of these funds, as here. There was no question, as here, of these payments being for future services, as doctors in retirement would not be rendering future services except some consultation. Payments were therefore current earnings, not of the doctors as future retirees, as their interests in many cases were unvested, but of the partnership, which by ordinary tax principles

passed through to the partners. This was not therefore an escrow to hold payments for future services until rendered, as is the case here.

The government also relies on a recent decision by this court, *Wheeler v. United States*, 768 F.2d 1333 (Fed.Cir.1985). In that case the taxpayers, individual officers and employees of the South Bend Tribune Corporation, Wheeler and McLaughlin, had benefited indirectly from payments out of a trust fund created by the employer to send children of a few favored employees to college. Payments had been made for their children. This "assignment of income" doctrine, and the *Basye* case as a precedent, was invoked to establish that those payments were really "earnings" of the taxpayers. There was no question, as here, of the trust being employed as an escrow for funds for the future, not yet earned, but to be earned, perhaps, in the future. We note, however, that to be consistent with its position herein, the IRS should have taxed Mr. Wheeler and Mr. McLaughlin on the basis of the employer's payments into the trust, not on the payments by the trust out of its corpus. The decision of the IRS to tax the payments out of the trust is consistent with ours here, since no question is raised here but that payments *out* of the fund held by State Street Trust Company will be taxable when paid, if paid to our taxpayer. *Fogarty v. United States*, 780 F.2d 1005 (Fed.Cir.1986) has been considered and is also not applicable to the instant case as a precedent.

The assignment of income doctrine had its birth in *Lucas v. Earl, supra*. At that time there was some inequity in the federal income tax between residents of community property states and other states, in that in the former spouses could treat themselves as recipients in equal parts of income earned by one only, and could file separate returns on that basis with substantial tax savings. The spouses in *Lucas v. Earl* were residents of a noncommunity property state and attempted to create the legal incidents of community property by contract between themselves. Justice Holmes, with his usual bold attitude to-

wards the law, invented and applied the assignment of income doctrine to thwart this effort. However, in *Poe v. Seaborn*, 282 U.S. 101, 51 S.Ct. 58, 75 L.Ed. 239 (1930), later the same year, the Court held that for spouses resident in a true-blue community property state, the assignment of income doctrine did not avail to return taxable income to the spouse who earned it. This is followed in *Commissioner v. First Security Bank, supra*, in circumstances wholly unlike both *Poe v. Seaborn* and the case we have at bar. These cases establish that the assignment of income doctrine cannot be applied to a taxpayer who may be thought to have earned the income, but is precluded from receiving it by operation of law rather than by a contract, which is itself viewed as the assignment. The zeal of our parties to show whether the FERC "imposed" the trust arrangement is thus explained. *Commissioner v. Harmon*, 323 U.S. 44, 65 S.Ct. 103, 89 L.Ed. 60 (1944) involved an Oklahoma statute that allowed spouses to elect whether to be under community property law or not. The majority, over a vigorous dissent by Justice Douglas, held that such election brought the case under *Lucas v. Earl*, not *Poe v. Seaborn*. This illustrates the legal and factual pitfalls confronting one who attempts to determine whether a supposed assignment of income is effected by operation of law or agreement of the parties. *Cf.* also *Fogarty v. United States, supra*. We believe that in cases of escrow to fund future performance, the law will treat a valid, binding contract among the parties the same as it will a statutory requirement, since these are not true "assignment of income" cases, the income not having been "earned."

Judge Kozinski viewed as "somewhat of a semantic trap" the issue "whether we view the utility as providing just energy on the one hand or energy plus decommissioning services." This is why he preferred to go off on his heavy regulatory hand theory. He was dealing with the government's argument that the payments into the trust were really current income to the utility because they were to compensate the utili-

ty for its commitment to decommission. We have already shown that the whole reason for creating the trust was that no confidence could be felt that payments, however designated, direct to the utility, would obtain dependable assurance that the facility would actually be decommissioned. The government's tax theory of the transaction, therefore, imputes to it an object for tax purposes that for regulatory purposes the parties sought to avoid, *i.e.*, to trust in the utility to decommission at the proper time because it has previously been paid to do so. Actually this tax theory works at cross purposes to the regulatory purpose because it allows the taxpayer utility a deduction for decommissioning at the very end, when there will be no taxable income for it to offset with the deduction, while the intended reimbursement will have been depleted by being taxed income already, without its offsetting expenses having been incurred. Such a mismatch between accrual of income, and costs, should itself throw into doubt any theory that requires it. We think in the circumstances that earmarking payments from ratepayers as intended to compensate the taxpayer now for its commitment to decommission at a future date, though not made to the taxpayer, is the semantic trap which one avoids who takes the trust fund as really meant for its intended purposes as spelled out in the trust agreement.

### Conclusion

In accordance with the foregoing discussion, the judgment of the Claims Court is affirmed.

AFFIRMED.

BALDWIN, Circuit Judge, concurs in the result.

I would affirm on the basis of Chief Judge Kozinski's opinion below. In my view, that opinion correctly concludes (based on undisputed facts), that the present situation is governed by *First Security Bank of Utah* rather than by assignment of income cases such as *Bayse* because, here, by operation of law the terms of the FERC order controlled the monies paid to and used by the trust.